## EQUITABLE CASUALTY & SURETY CO. et al. v. HELENA WHOLESALE GROCERY CO.

No. 9417.

Circuit Court of Appeals, Eighth Circuit.

July 15, 1932.

Barber & Henry and Troy W. Lewis, all of Little Rock, Ark., for appellants.

John I. Moore, of Helena, Ark., C. E. Daggett and J. B. Daggett, both of Marianna, Ark., and J. G. Burke and John I. Moore, Jr., both of Helena, Ark., for appellee.

Before GARDNER, SANBORN, and BOOTH, Circuit Judges.

GARDNER, Circuit Judge.

The appellee, Helena Wholesale Grocery Company, with certain other claimants, brought this suit in the name of the United States for the use and benefit of plaintiffs, against G. C. Weathers, Jr., C. J. McFarlin, and the Equitable Casualty & Surety Company of New York, the suit being brought under the provisions of the Act of August 13, 1894, as amended February 24, 1905 (40 USCA § 270). Weathers was the general contractor, and McFarlin his subcontractor, under a contract with the United States for the construction of certain sections of a levee

known as the White River Levee district, Knowlton, Ark. In the performance of the contract both Weathers and McFarlin established and maintained camps for housing and feeding their laborers. At each camp a commissary or storeroom was established, from which the cooks at the boarding houses obtained supplies for the meals furnished laborers engaged in the work. Helena Wholesale Grocery Company, during the course of the work under this contract, sold groceries and supplies to both Weathers and McFarlin, which were used to feed the laborers working for them on this project. Weathers furnished a bond for the faithful performance of his contract, as required by statute, and the Equitable Casualty & Surety Company executed it as his surety. This bond contained provision that Weathers "shall promptly make payment to all persons supplying the principal with labor and materials in the prosecution of the work provided for in said contract." Previous to the execution of this bond, the Equitable Casualty & Surety Company had, pursuant to the statutes of Arkansas, executed what is termed a qualifying bond, in the sum of $50,000, as a condition precedent to its right to transact business in the state of Arkansas, the appellant National Surety Company being the surety on that bond. This bond provided that: "If the said principal shall promptly pay, when due, all claims and obligations arising or accruing in this State by virtue of any bond or contract made by said principal; and all amounts due the State of Arkansas, by virtue of any statute, and in all respects comply with the laws of said State, then this obligation shall become void, otherwise to remain in full force and effect."

After the commencement of this suit, the National Surety Company, on its application, was granted leave to appear in said cause and defend all claims of plaintiffs and interveners as against the Equitable Casualty & Surety Company, the Equitable Casualty & Surety Company having in the meantime become insolvent. On motion of the National Surety Company, the suit was transferred to the equity docket, and was referred to a master, with directions so far as material here as follows:

"1. The master is directed to state an account between G. C. Weathers, Jr., the principal contractor, and C. J. McFarlin, subcontractor; he shall credit McFarlin with the amount of labor done under the contract, and then charge him with the amount heretofore paid him by Weathers, together with such other amounts as Weathers has heretofore paid or agreed to pay to the parties performing labor for and/or furnishing supplies and materials to McFarlin as such sub-contractor; and further determine any sum which the said McFarlin is entitled to recover on the contractor's bond sued on herein. Also determine whether Weathers and McFarlin were partners.

"2. The master is directed to ascertain, determine and state the amount of groceries, feed, cash and/or other material and/or supplies, or what other kind and/or character, furnished the contractor, Weathers, and/or sub-contractor, McFarlin, by the Helena Wholesale Grocery Company, which were used by the said Weathers and/or McFarlin in the prosecution of and to facilitate the work done under the contract with the United States and for which the Helena Wholesale Grocery Company would be entitled to recover on the contractor's bond under the act of Congress herein involved."

Other parties intervened before the trial of the suit to establish their claims upon the bond, and there were other questions and claims to be considered; but the only claim involved on this appeal is that of the appellee, Helena Wholesale Grocery Company. The master allowed this claim in substantial amounts. The lower court approved the findings of the master, overruling appellants' exceptions thereto, and entered a decree in favor of the Helena Wholesale Grocery Company for its claims against Weathers, McFarlin, and the surety companies. From the decree so entered the surety companies have perfected this appeal. The assignments of error go only to the sufficiency of the evidence to sustain the findings of the master, and counsel for appellants in their brief frankly state that: "If the evidence in the record sustains the conclusion that the situs of the camps, where the work was performed by Weathers and McFarlin, or either of them, was a comparative wilderness; that there was no dependable means of procuring food and shelter for the laborers engaged in the work; that the contractor was compelled, through the demand of union labor rules and regulations, or by reason of the wildness and desolation of the location of the work, or an inability to procure board and lodging, or suitable supplies from independent sources, to provide board and lodging for his laborers, such being indispensable to the prosecution of the work and an integral part thereof, and that such boarding houses, or supplying of groceries to his laborers, were conducted or used exclusively in the perform-

ance of the work, then the judgments herein appealed from must be affirmed."

The issues thus stated may be summarized as follows: (1) Was the territory in which the work was performed a comparative wilderness? (2) Was there an independent and dependable source of provision for the laborers? (3) Was it necessary for the contractors to establish boarding houses? (4) Were the groceries used exclusively in the prosecution of the work provided for in the contract?

The statute under which Weathers gave his bond, in so far as material here, provides that: "Any person or persons entering into a formal contract with the United States for the construction of any public building, or the prosecution and completion of any public work, or for repairs upon any public building or public work, shall be required, before commencing such work, to execute the usual penal bond, with good and sufficient sureties, with the additional obligation that such contractor or contractors shall promptly make payments to all persons supplying him or them with labor and materials in the prosecution of the work provided for in such contract."

The master specifically found that the territory in which the work was being done was a comparative wilderness; that there was no independent and dependable source of supplies for the men and animals, except that furnished by the contractors; that a necessity existed for the establishment of boarding houses by the contractors; that the groceries sold by the Helena Wholesale Grocery Company to the contractor and subcontractor were used exclusively in the prosecution of the work provided in the contract. These findings were confirmed by the lower court, and the rule of this court, established by repeated decisions, is that, where matters of fact have been passed upon and agreed upon by two lower tribunals, they will not be reversed, unless it is very clearly made to appear that there was no substantial evidence upon which to base the finding. White River Levee Dist. v. McWilliams Dredging Co. (C. C. A.) 40 F.(2d) 873; Road Improvement Dist. No. 4 v. Wilkerson (C. C. A.) 5 F.(2d) 416; Houchin Sales Co. v. Angert (C. C. A.) 11 F.(2d) 115; Quinn v. Union Nat. Bank (C. C. A.) 32 F.(2d) 762; Westinghouse Electric & Mfg. Co. v. Wagner Electric & Mfg. Co. (C. C. A.) 281 F. 453; Wootton Land & Fuel Co. v. Ownbey (C. C. A.) 265 F. 91.

In its general features the instant case is similar to the case of Brogan v. National Surety Co., 246 U. S. 257, 38 S. Ct. 250, 252, 62 L. Ed. 703, L. R. A. 1918D, 776, and it was manifestly tried in the lower court on the theory that it was fundamentally governed by that case. The importance of the issues of fact here presented becomes apparent when the decision in the Brogan Case is considered. In that case the court said: "The Circuit Court of Appeals [228 F. 577, L. R. A. 1917A, 336] deemed immaterial the special circumstances under which the supplies were furnished and the findings of fact by the trial court that they were necessary to and wholly consumed in the prosecution of the work provided for in the contract and bond. In our opinion these facts are not only material, but decisive. They establish the conditions essential to liability on the bond. The bare fact that the supplies were furnished to the contractor and were consumed by workmen in its employ would have been immaterial. A boarding house might be conducted by the contractor (like some company stores concerning which states have legislated, Keokee Consol. Coke Co. v. Taylor, 234 U. S. 224, 58 L. Ed. 1288, 34 S. Ct. 856) as an independent enterprise undertaken solely in order to utilize the opportunity for separate and additional profit afforded by the congregation of many laborers in the particular locality where the public work is being performed. The laborers might resort to such a boarding house in the exercise of individual choice in the selection of an eating place. Under such circumstances the furnishing of supplies would clearly be a matter independent of the work provided for in the contract and would not entitle him who had furnished the groceries used in the boarding house to recover on the bond. But here, according to the undisputed facts and the findings of the trial court, the furnishing of board by the contractor was an integral part of the work and necessarily involved in it. Like the supplying of coal to operate engines on the dredges, it was indispensable to the prosecution of the work, and it was used exclusively in the performance of the work. Groceries furnished to a contractor under such circumstances and consumed by the laborers, are materials supplied and used in the prosecution of the public work."

The question whether the evidence shows that the territory in which the work was performed was a comparative wilderness arises by reason of the language of the court in the

Brogan Case, wherein the court, speaking through Mr. Justice Brandeis, said:

"The facts undisputed or as found by the lower court and accepted by the court of appeals were these: The Standard Contracting Company, undertook to deepen the channel in a portion of St. Mary's river, Michigan, located 'in a comparative wilderness at some distance from any settlement. There were no hotels or boarding houses' and the contractor 'was compelled to provide board and lodging for its laborers.' * * *

"The supplies furnished by Brogan under these circumstances were clearly used in the prosecution of the work, just as supplies furnished for the soldiers' mess are used in the prosecution of war. In each case the relation of food to the work in hand is proximate."

Responding to this issue the master on conflicting evidence found that:

"The territory was practically abandoned, and with the exception of a few scattered patches of corn and hay, remained uncultivated and untenanted for three years. The evidence shows that much of it had grown up in small growth. It is unquestioned from the evidence that there were in that section no hotels, no boarding houses, and no adequate means of housing the labor necessary for the prosecution of the work under the contracts. In view of the conditions surrounding the country at the time the work was entered upon, it would have been, in the opinion of the Master, foolhardy for any contractor to have relied upon the meager facilities existing therein for the care of labor, and that without the provision on the part of the contractor and sub-contractor unless boarding places had been provided, labor could not have been secured, nor could it have been maintained in sufficient force to have completed the jobs. Therefore, the Master adopts in this case the facts as found in the Brogan Case, supra, that these contracts were located 'in a comparative wilderness at some distance from any settlement. There were no hotels nor boarding houses and the contractor was compelled to provide board and lodging for its laborers.' The fact that there were stores at Snow Lake and Ferguson, a commissary at Thornton's plantation, and a small business operated by Watson near the Weathers' camp, when taken into consideration with the time of the year, the lack of roads, the difficulty of transportation would not, in the judgment of the Master, have removed the necessity for the accumulation of stores in the camp commis-sary from which a steady supply of staple articles of food might be drawn for the sustenance of the laborers, without regard to almost impossible conditions during the winter season."

An examination of the evidence convinces that this finding is not only sustained by substantial evidence, but by a clear preponderance thereof. While the land in the locality in which this work was prosecuted had been in a high state of cultivation prior to 1927, it had been almost totally abandoned owing to the floods of 1927, 1928, and 1929, and at the time of performing the work under this contract the country was, as found by the master, virtually a wilderness. The work was done in the winter of 1929–1930, during a rainy season, when the roads from the camp were practically impassable.

In view of this conclusion, it would not seem to be necessary to consider the second and third contentions of appellants, to the effect that there were at hand independent and dependable sources of provision for the laborers, and that it was not necessary for the contractors to establish boarding houses. We shall, however, advert to appellants' contentions. It is urged that there was a store owned by one Watson at the Weathers' camp, but this was a very small establishment, and the owner's own testimony shows that it was wholly inadequate as a source of supply. As paraphrased in the record, the owner testified: "He would sell to anybody who had the money. Watson did not run a general merchandise store but had a few groceries, no dry goods, his principal business being the buying of furs. He was in Weathers' commissary two times but did not care to compare Weathers' stock of merchandise with the stock that he, Watson, carried. He, Watson, carried between $200 and $300 worth of stock in his store. If arrangements could have been made for a line of credit, he could have supplied Weathers' camp, but his (Watson's) credit was mighty bad."

Other witnesses testified that the Watson place was a lunch counter, carrying cakes, cold drinks, etc., with only a few staple groceries.

It is also urged that there were stores at Snow Lake and at Ferguson, but the stores at Snow Lake were over three miles from the McFarlin camp and many miles farther from the Weathers' camp, while the stores at Ferguson were sixteen miles from the McFarlin camp and four miles from the Weathers' camp. The master found that these were

not reliable sources of supply, owing to the bad roads. Under these circumstances, it seems clear that the contractors were not only warranted in establishing eating houses at their camps, but were compelled so to do. Even though there were grocery stores at hand, that would not alter the situation, but would simply mean that the contractors might have purchased the groceries and meats from other parties than appellee. But men cannot be fed upon raw groceries; it requires boarding places to accommodate them. The necessity for operating an eating place at the work camps would certainly exist, even though there were nearby groceries and markets from which supplies might be secured; and it is no defense to appellee's claim to say that the provisions which it furnished could have been secured elsewhere.

■ It is also urged that the commissaries were operated for profit. The contractor deducted from each laborer's wages the sum of $4 a week for the groceries and supplies furnished the cooks from the commissary. The white laborers were paid wages in money and board, and their food came out of the commissary. The negroes were assessed $1 each per week from their wages for pay for the cooks. In view of the necessity for the establishment of boarding houses and their maintenance for feeding the laborers, the method employed by the contractor for collecting compensation for the meals supplied could be of no concern to appellee. The statute gives a right of action on the bond to any person supplying labor or supplies in the prosecution of the work provided for in the contract. This statute should be liberally construed to protect those furnishing labor and materials. Brogan v. National Surety Co., 246 U. S. 257, 38 S. Ct. 250, 62 L. Ed. 703, L. R. A. 1918D, 776; Illinois Surety Co. v. John Davis Co., 244 U. S. 376, 57 S. Ct. 614, 61 L. Ed. 1206; United States, for Use of Samuel Hastings Co., v. Lowrance (C. C. A.) 252 F. 122. The supplies furnished by appellee were indispensable to the prosecution of the work, and they were used exclusively in the performance of the work. Under the circumstances disclosed by the record in this case, they constituted material supplied and used in the prosecution of the public work.

We are entirely satisfied with the findings of the master, which were approved by the lower court, and under these findings the claims of the appellee were properly allowed, and the decree appealed from is therefore affirmed.