**BERTHOLD–JENNINGS LUMBER CO. et al.
v. ST. LOUIS, I. M. & S. RY. CO. et al.***

No. 9945.

Circuit Court of Appeals, Eighth Circuit.

Nov. 7, 1935.

*Certiorari denied 56 S. Ct. 591, 80 L. Ed. ——.

STONE, Circuit Judge, dissenting in part.

Lee B. Ewing, of Nevada, Mo., and Clifford B. Allen, of St. Louis, Mo., for appellants.

**34**

Thomas T. Railey and Edward J. White, both of St. Louis, Mo., for appellees.

Before STONE, GARDNER, and VAN VALKENBURGH, Circuit Judges.

GARDNER, Circuit Judge.

This is an appeal from a decree entered after hearing on certain exceptions to a report of a special master, which denied preferential payment to certain claims of appellants for overcharges made by a carrier in intrastate commerce, but which allowed them as general claims. The issues require a somewhat extended statement of the history of the litigation and the facts in connection with which the claims of appellants arose.

In 1905 (Laws 1905, p. 102), the Legislature of Missouri passed the so-called "Maximum Freight Acts," which were amended in 1907 (Laws 1907, p. 171). These acts fixed the maximum freight rates to be charged by railroads in Missouri for the transportation of certain commodities. The validity of the acts are not here in question. Numerous railroads, including the appellee St. Louis, Iron Mountain & Southern Railway, commenced actions to enjoin the enforcement of these rates on the ground that they were confiscatory and discriminatory. These actions were begun June 16, 1905, prior to the effective date of the 1905 amendment, and on June 17, 1907 a temporary injunction was granted which enjoined the enforcement of the Maximum Freight Rate Acts. The order contained provision that, "pending the further hearing and determination of this case, the complainant shall preserve and keep in existence its way bills for state freight."

On April 17, 1909, a final decree was entered permanently enjoining the enforcement of the rates. On June 16, 1913, the Supreme Court reversed the decision of the lower court. Knott et al. v. Ry. Co., 230 U.S. 474, 33 S.Ct. 975, 57 L.Ed. 1571. On February 6, 1914, the court, then the United States District Court for the Western District of Missouri, dismissed the bill of complaint of the carriers, dissolved the injunction, and provided: "But with the right of any party seeking to proceed in this court will have the right to do so. And for that purpose a master will be appointed. But those claimants who do not thus elect to come into this court will not be bound so to do

by any order of this court. They are left free to go to such courts as they may select."

Nothing in the decree of 1909, nor this decree, required preservation of way-bills.

During the entire period that the injunction was in force, the St. Louis, Iron Mountain & Southern Railway Company charged and collected rates for the transportation of intrastate freight pursuant to its own tariffs, which rates were higher than those permitted by the Missouri Maximum Freight Rate Acts.

On August 19, 1915, the Commonwealth Steel Company filed a creditor's bill against the St. Louis, Iron Mountain & Southern Railway Company, alleging insolvency and seeking the appointment of a receiver. On the same day a receiver was appointed. The order appointing the receiver also appointed a special master, and provided, among other things, that: "All petitions, intervening petitions and other demands against the Receiver herein, or against the property in his possession, shall, when filed with the Clerk of this Court, stand referred to this Special Master. Said Special Master shall, from time to time, after giving reasonable notice to the parties in interest, hear such proofs and arguments as the parties may desire to submit; make report to this Court of the facts and of his conclusions of law in each case, and file the same with the Clerk of this Court."

On July 3, 1916, an order was entered providing that: "Holders of unsecured claims or demands against said defendant are hereby required to file statements of the nature, dates of accrual and amounts of their respective claims and demands, duly verified by the oath of the president or by any officer of the corporation making such claims with the Special Master."

Following the appointment of the receiver, the creditor's suit was consolidated with a suit commenced by the Union Trust Company of New York and Benjamin F. Edwards, as trustees, against the St. Louis, Iron Mountain & Southern Railway Company, which sought a decree of foreclosure of a mortgage on property of the railway company. In this consolidated suit the receivership was continued. There was certain property not subject to this mortgage. A final decree was entered, adjudging that the mortgage was a valid and subsisting lien upon the properties therein described "to the extent and for

the amount found in this decree to be due and payable upon the outstanding bonds and coupons secured thereby, said lien being superior and senior to any and every estate, right, title, interest, claim or lien in or to the same, or any part thereof, of any person whomsoever. * * *"

The court found that there was property not subject to the lien of this mortgage and decreed a sale of all the property mortgaged and unmortgaged, and provided that the net proceeds of the sale be distributed among creditors "in accordance with their respective priorities and rights." The proceeds of the sale of the mortgaged property were directed to be applied, after the payment of costs, to the payment of the mortgage debt, while the net proceeds of the sale of the unmortgaged property, after the payment of certain costs, were directed to be applied to the payment of unsecured claims. No priority was adjudicated among the various general claims, and the decree contains the following provision: "Payments of the claims * * * shall be made ratably and proportionately to the persons whose claims shall have been so allowed and established, or shall hereafter, pursuant to the provisions of this decree, be so allowed and established."

The court, however, reserved jurisdiction to pass upon questions of priority by provision in the decree.

The decree provided that the purchasers of any of the mortgaged property should take the same upon the express condition that they would pay, satisfy, and discharge "any unpaid claims of creditors of the Railway Company * * * which have been or shall be admitted by the parties in interest or adjudged by this court to be prior in lien or superior in equity to the mortgage." Creditors secured by the mortgage were excepted from the provision.

The property was sold under a plan of reorganization May 12, 1917, the details of which do not seem to be pertinent to the issues here present.

The deed to the purchaser of the railroad properties shows that the Missouri Pacific Railway Company, the reorganizing corporation which ultimately secured title to the property, agreed to pay "any unpaid claims of creditors * * * which have been or shall be admitted by the parties in interest or adjudged by said court to be prior in lien or superior in

equity" to the mortgage "to the extent that they shall not have been paid out of moneys in the possession of the receiver." Secured claims were excepted from this agreement.

The plan of reorganization as approved by the court gave appellants and other unsecured creditors the right to establish their claims against the receiver as preferred and prior to the mortgage, and to assign them to the reorganization managers so that if denied preference and priority, they could obtain preferred stock in settlement as other general unsecured creditors. Appellants have made no such assignments, and the time for such assignment has long since expired.

Appellants' claims are all based on overcharges made on intrastate shipments in Missouri, while the injunctions against enforcement of the Missouri Maximum Freight Rate Acts were in force. None of the claims were filed in the rate injunction suit, but in 1916 they were filed with the special master in the receivership suit. The claims filed in 1916 are general in nature, the claim of the Berthold & Jennings Lumber Company being typical of them all. It was filed as an intervening petition, and alleges that the shipments on which the overcharges were made were made by it over the line of the St. Louis, Iron Mountain & Southern Railway Company wholly within the state of Missouri. It is alleged: "That the commodity or commodities, the point or points of origin, the point or points of destination, the approximate number of cars, and the approximate amount of the overcharge, were as follows: Commodity: Lumber and other commodities named in said maximum rate laws; Point of Origin; Ferguson, Williamsville, Bailey, Cornwall, and other stations all in Missouri; Point of destination: St. Louis and other stations all in Missouri; Approximate number of cars: 225; Approximate overcharge: $4,000.00."

There are other allegations not here material. An accounting was demanded for the ascertainment and determination of the exact amount of the excess charges; that in aid thereof a discovery be had of the books, papers and memoranda of the railway; and "that the amount of your intervener's said claim so ascertained and determined to be declared and decreed preferred to all other claims to the extent of the portion thereof which passed into

the possession or custody of said receiver, either in cash or its equivalent, or in the form of some other asset into which the same has been converted; that the same be impressed with an equitable lien in favor of your intervener; that your intervener's claim, when so allowed, be ordered paid, with interest, in due course."

Some nine years later, on January 10, 1925, an order was entered which permitted any intervener within ninety days of the order to file with the special master application for leave to file an amended itemized petition, to be supported by the amended petition attempted to be filed. This order provided that the master, upon notice to the parties in interest, should set down for hearing the application for leave to file such amended petition and should report to the court his findings of fact and conclusions of law with respect thereto. Thereupon counsel for appellants petitioned the court for an order requiring inspection of the carrier's waybills for the purpose of enabling them to draft amended itemized claims. The court denied this application.

Amended petitions were tendered July 5, 1925, which abandoned the prayer for an accounting and a discovery, but which prayed for "a preferred payment as against the bondholders, mortgagees, lienors and other creditors of the said railway company, and that said sum and each of them be declared a trust fund in the hands of the receiver and for such other further relief as the equity of the case permits and may be just and proper in the premises." Of the petitions tendered, some were fully itemized, others partially itemized, and some were wholly unitemized. The defendants resisted the filing of these petitions out of time. The master recommended that they be permitted to be filed, provided the number of cars involved and the total amount claimed should not exceed the total cars and the total claim contained in each corresponding original petition. This recommendation was approved by the court, and to comply with the order appellants made certain eliminations from the amended petition.

The overcharges, when collected, were commingled with the other funds of the railway company, and out of these funds were paid accrued interest, taxes, dividends, operating expenses, and expenditures for new construction. It was stipulated that all money collected "was used in the usual course for all purposes that money is usually used by railroad companies in the operation of their property," and that "during the period from June, 1913 to the date of the receivership the bank accounts of each of these banks (this refers to the bank accounts in which the money of the St. Louis, Iron Mountain and Southern were deposited) were on at least one occasion overdrawn, or practically overdrawn."

In 1925, appellants requested blanket authority from the court to inspect the carrier's records, which was denied.

Motions to require the unitemized portions of the amended petitions to be made more specific were submitted to the court and granted, on the ground that defendants were entitled to know what particular cars were involved, to the end that they might interpose special defenses and plead payment of one claim as a bar to duplicate claims on the same shipment. The unitemized claims were not amended and were therefore disallowed.

At the sale, the property subject to the mortgage sold for $21,500,000, and the property not subject to the mortgage sold for $2,000,000. It appears that the overcharge claimants are not the only creditors. Approximately $1,000,000 from the proceeds of the sale of the unmortgaged property was reserved by the special master for the purpose of meeting the contingent liabilities of the priorities alleged to inhere in the overcharge claims. In addition to the overcharge claims, there were general unsecured claims stated by the master to be "not in excess of $650,000," and the deficiency on the first and refunding mortgage of $35,752,830.14.

The amended petitions allege that the petitioners are entitled to "preferential payment * * * out of the income or corpus of said estate coming into the hands of said receiver."

Upon the issues made by the amended petitions in their final form and the answers thereto, the special master took testimony, and filed a report to which both parties filed exceptions. The administrative judge overruled the exceptions of the petitioners, and sustained two of the exceptions of the defendants. In sustaining one of these, the court overruled the conclusion of the master to the effect that destruction by the carrier of waybills covering shipments out of which the overcharges arose justified application of the doctrine of evidence, omnia praesumuntur

contra spoliatorem. The waybills destroyed covered the period involved prior to January 1, 1911. The master found: "That there are no facts in evidence which would justify the finding, that the destruction of said records was 'willful,' 'intentional,' or with 'fraudulent design,' as those words are used in connection with the presumption relating to the application of said maxim."

The other exception sustained is not material on this appeal.

Certain shipments involved were routed on the carrier's line up the east side of the Mississippi river, which caused them to move in Illinois and thus in interstate commerce, although the points of origin and destination were both in Missouri. With respect to these shipments, the evidence disclosed that in routing to and from St. Louis from stations in southeastern Missouri the stations were divided into three distinct groups: (1) Stations from which shipments to St. Louis in the usual course were routed up the west side of the river; (2) stations from which, in the usual course, shipments were routed up the east side of the river and back over Ivory Transfer to St. Louis; and (3) so-called optional routing stations from which shipments might have moved either way, depending upon the convenience of the local operating officials. There was a very heavy grade up the west side of the river so that as far as practicable all freight moving between southeastern Missouri points and St. Louis was routed via the water level line on the east side of the river. Instructions regarding such routing were embodied in a routing circular, and the same specific rates applied regardless of the routing, so that a difference in mileage over either route made no difference in the applicable rates. The tariff containing these rates was filed with the Interstate Commerce Commission and with the Railroad and Warehouse Commission of Missouri. The master held that shipments actually shown to have moved up the east side of the river, or from points which under existing instructions were presumably transported up the east side of the river, were interstate, and the trial court approved this holding.

In many instances the weight of a particular shipment was not in evidence, and in such instances the master limited recovery to the tariff carload minimum weight.

In support of certain grain shipments, a Mr. Roberts, an accountant, offered certain summaries and copies of lost or destroyed grain commission records, which the master and the court rejected as inadmissible.

The Missouri Pacific Railroad Corporation, the reorganizing company which acquired the property of the St. Louis, Iron Mountain & Southern Railway Company, entered its appearance in the suit as a defendant and the propriety of permitting it to defend is not here questioned.

The final decree of the court allowed appellants judgment for certain sums, but allowed them "as general unsecured obligations of the St. Louis, Iron Mountain and Southern Railway Company, with interest calculated to the date of receivership."

Appellants on this appeal contend (1) that the overcharges were entitled to preferential payment; (2) that the doctrine of omnia praesumuntur contra spoliatorem should be applied; (3) that the court erred in compelling more definite statements of the claims, and in requiring claimants to amend their amended petitions by reducing the amount of overcharges specified therein to the approximate sum claimed in the original petitions, and also by reducing the number of cars specified in the amended petitions to the approximate number estimated in the original petitions; (4) that the testimony as to the grain commission records was competent; (5) that the court erred in holding that the shipments moving through Illinois on the east side of the river were in interstate commerce; and (6) that the court erred in applying tariff minimum carload weights in the absence of proof of actual weights.

1. Were appellants entitled to preferential payment of their claims?

(a) There are certain classes of claims which when they arise within six months prior to receivership are held to be preferential. In Pitcairn v. Fisher, 78 F.(2d) 649, 652 (opinion filed July 22, 1935), the rule with reference to this character of preference is stated by this court as follows: "It is of course, well-settled that there are classes of claims, which have come to be held as preferred when they arise within six months prior to receivership. See Fosdick v. Schall, 99 U.S. 235, 25 L.Ed. 339; St. Louis, etc., Railroad Co. v. Spiller, 274 U.S. 304, loc. cit. 311, 47

S.Ct. 635, 71 L.Ed. 1060. In the main, such claims thus given preference are claims for labor, supplies, equipment, and improvements to the corpus, in the hands of the receivers. The preference thus accorded rests upon the view that the things furnished were necessary to the upkeep and preservation as a going concern of the properties; or that by the use of the things furnished there has been additional value given to the properties, so that the security has been augmented. These are, of course, cold legal reasons; but absent a statute, and there is none, such reasons must prevail."

In Love v. North American Co. (C.C. A.) 229 F. 103, 106, claims for overcharges were allowed as preferential within this so-called "six-month rule," but it is important to note the facts in that case as they were radically different from those in the case at bar. It there appeared that $88,751.86 was claimed as preferential in a railroad receivership, because pending an appeal in a rate case to the Supreme Court of Oklahoma, the carrier had exacted higher rates than the Corporation Commission of Oklahoma had fixed. On appeal, the Supreme Court of Oklahoma prescribed rates lower than those collected by the carrier, but higher than those allowed by the commission. The carrier attacking the rates had superseded their enforcement by bond pending appeal. A surety on the supersedeas bond paid $12,-124.51 of this amount, and the balance seems not to have been covered by bond. Within six months, and that seems to be important, after the decision of the Supreme Court, an unsecured creditor commenced an action in which a receiver for the railway company was appointed, and later there was consolidated with this action a suit to foreclose a general lien mortgage on the railway property. Subsequent to the collection of the excess charges by the railway company, there was at all times in its treasury, down to the date of the appointment of the receivers, an amount of money equal to or in excess of the aggregate sums so collected. The gross receipts from the commencement of the period when excess charges were made, to and during the receivership, were in excess of actual operating expenses. When the receivers were appointed, they received from the railway company over $600,000 in cash.

While some of these facts are not necessary for consideration of the so-called "six-month rule," they are, we think, material on the next question considered, that of trust.

It is important now to observe that, within six months of the final decision in the Love Case, adjudicating the rates of the carrier excessive, the creditors' bill was filed and a receiver appointed. The importance of that fact is indicated by the opinion in which it is said: "The claims of the shippers arose at the time the Supreme Court of Oklahoma decided the appeals, namely, December 5, 1912, which was within six months from the date on which the receivers were appointed."

Manifestly, one of the reasons for holding the claims preferential was that they were within the "six-month rule." In the instant case, the decision of the Supreme Court was filed June 16, 1913. The trial court dismissed the complaint February 16, 1914, and no action was taken seeking an enforcement of the claims here involved until August 19, 1915, when the creditors' bill was filed and a receiver appointed.

The general facts in this case are very similar to those in St. Louis & S. F. R. Co. v. Spiller, 274 U.S. 304, 47 S.Ct. 635, 637, 71 L.Ed. 1060. In that case, as in the case at bar, overcharges were collected more than six months prior to the appointment of a receiver, and the Supreme Court held that there could be no preferential status given the claims under the "six-month rule." In the course of the opinion it is said:

"We need not determine whether the noncontractual claim here in suit is in its nature within the class of debts entitled to preferential payment under the doctrine of Fosdick v. Schall. For, by long established practice, the doctrine has been applied only to unpaid expenses incurred within six months prior to the appointment of the receivers. * * * The cases in which this time limit was not observed are few in number and exceptional in character. See Burnham v. Bowen. 111 U.S. 776, 780-783, 4 S.Ct. 675, 28 L.Ed. 596; Union Trust Co. v. Morrison, 125 U.S. 591, 8 S. Ct. 1004, 31 L.Ed. 825. In no case which has come to our attention has the doctrine been applied to liabilities which, like those here in question, accrued many years before the receivership began."

The excess charges here involved were collected from 1905 until the decision of the Supreme Court, filed June 16, 1913.

No preference can therefore be allowed under the doctrine of the "six-month rule."

 (b) Another ground of preference urged is that of trust. A preference was sustained on that ground as well as the "six-month rule," in Love v. North American Co., supra, but, as has already been observed, in the Love Case the funds were traced into the treasury of the company and thence into the hands of the receiver, so that the trust fund doctrine was properly applied. In this case, however, there has been no tracing of funds; in fact, it appears that during the period from June, 1913, to the date of the receivership, the bank account of the St. Louis, Iron Mountain & Southern Railway Company on at least one occasion was overdrawn and its funds exhausted. It is essential to the enforcement of such a trust that the funds be traced into the hands of the receiver. St. Louis & S. F. R. Co. v. Spiller, 274 U.S. 304, 47 S.Ct. 635, 637, 71 L.Ed. 1060; Litchfield v. Ballou, 114 U.S. 190, 5 S.Ct. 820, 29 L.Ed. 132; Farmers' National Bank v. Pribble (C.C.A. 8) 15 F.(2d) 175; In re United Cigar Stores Co. (C.C.A. 2) 70 F.(2d) 313; Empire State Surety Co. v. Carroll County (C.C.A. 8) 194 F. 593; In re Matthews' Sons (C.C.A. 2) 238 F. 785; Elkins v. First National Bank (C.C. A. 4) 43 F.(2d) 777.

In St. Louis & S. F. R. Co. v. Spiller, supra, it is said: "The assertion that the money collected can be traced into the receiver's hands is confessedly without any support except the stipulated fact that, throughout the ten years which elapsed between the earliest exaction and the transfer of the properties to the new company, the old one and the receivers had, at all times, in the several banks on which checks for current expenses were drawn, a working balance, in the aggregate, largely in excess of Spiller's claim. Such a showing fails to bring the present case within the rule by which, when trust funds are mingled with others, the cestui may assert an equitable lien upon the mingled mass to the extent of his contribution thereto. * * * An illegal exaction does not impress an indelible trust upon all funds which the wrongdoer and his successors may thereafter have on deposit in their banks. For aught that appears, all the money illegally exacted may have been spent for current operating expenses."

The fact that trust property went into the general estate and increased the amount and value thereof is not sufficient, and when a trust has once been dissipated subsequent deposits made in the due course of business without any specific intention to restore the trust fund are not to be applied to such restoration. Conqueror Trust Co. v. Fidelity & Deposit Co. (C.C.A. 8) 63 F.(2d) 833. Preference cannot therefore be granted appellants' claims on any theory of constructive trust.

██ (c) It is a general rule that all unsecured creditors stand on the same basis, and as to them equality is equity. To warrant the enforcement of the claim of one creditor over those of another, there must be something in the intrinsic nature of such claim conferring an equity superior to that of the creditors over whom he claims a preference. Van Raalte v. Enterprise Transp. Co. (C.C.A. 1) 169 F. 606.

 Throughout the litigation in the rate case, there was no impounding of the funds arising from the excess rates, nor was any bond required of or furnished by the carrier to secure a refund in the event of a final decision against it. No supersedeas bond was given on appeal to the Supreme Court; in fact, the decree was in favor of the carrier, and it remained in full force and effect during all the time that these excess charges were being collected. In these circumstances, it would be illogical to hold that these acts of the carrier, which were in accord with the decision of the court, were wrongful or of such turpitude as to make it or its receiver a trustee ex maleficio. But even a trust ex maleficio cannot be enforced where the funds have not been traced into the hands of the malefactor. The reversal of a judgment does not make void what has been done under it. Bank of U. S. v. Bank of Washington, 6 Pet. 8, 8 L.Ed. 299; Bridges v. McAlister, 106 Ky. 791, 51 S.W. 603, 45 L.R.A. 800, 90 Am.St.Rep. 267. A judgment, even though later reversed, protects one who acts under it. What is lawful when done does not become unlawful by reason of subsequent acts any more than acts which were not criminal when committed can be made criminal by subsequent occurrences. The court in entering a judgment does not act as agent for either party, and a litigant does not procure a judgment in any such sense as to render him responsible for the consequences of the judgment on its reversal by a higher court. A subsisting judgment of a court which had jurisdic-

tion of the parties and the subject-matter constitutes a complete justification for all acts done in its enforcement until it is reversed. Bridges v. McAlister, 106 Ky. 791, 51 S.W. 603, 45 L.R.A. 800, 90 Am.St.Rep. 267; Peck v. McLean, 36 Minn. 228, 30 N.W. 759, 1 Am.St.Rep. 665; Thompson v. Reasoner, 122 Ind. 454, 24 N.E. 223, 7 L.R.A. 495.

[7-9] Generally, upon reversal, especially if the reversal determine the merits of the controversy between the parties, the judgment creditor is subject to the liability for restoration of what he may have received under the judgment. This is not for any supposed wrong on his part in enforcing the judgment, but on the ground that in equity and good conscience he ought, after reversal, to restore to the appellant everything of value which he received on account of the erroneous judgment.

The reversal of the judgment in the instant case created a new cause of action in the parties who paid the excess charges, and it gave rise to a legal obligation on the part of the carrier to restore what it had received in the way of excess charges. Bank of U. S. v. Bank of Washington, 6 Pet. 8, 8 L.Ed. 299. Concerning this right of restitution, the Supreme Court in B. & O. R. Co. v. United States, 279 U.S. 781, 49 S.Ct. 492, 493, 73 L.Ed. 954, says:

"The right to recover what one has lost by the enforcement of a judgment subsequently reversed is well established. And, while the subject of the controversy and the parties are before the court, it has jurisdiction to enforce restitution and so far as possible to correct what has been wrongfully done. * * * *When the erroneous decree was reversed and the invalid order was set aside, the law raised an obligation against each of the west side roads to make restitution of the payments made by the east side roads in compliance with the order."* (Italics supplied.)

Where specific real or personal property has been appropriated under a judgment which is later reversed, and the property remains in the hands of the other party, the solution is, of course, simple. The court in which the litigation is pending, then having jurisdiction of the parties and the subject-matter, may compel restitution of the property in specie, or an independent action may be maintained, based

upon the right of restitution. But where the claim is for money received, and an independent action is brought, it is an action in the nature of indebitatus assumpsit, or for money had and received. Atlantic Coast Line R. Co. v. State of Florida, 295 U.S. 301, 55 S.Ct. 713, 79 L.Ed. 1451; Champ Spring Co. v. United States (C.C.A.8) 47 F.(2d) 1; Bradley Lumber Co. v. Bradley County Bank (C.C.A.8) 206 F. 41. Such an action would ordinarily result in a money judgment without right of preference. Appellants were not parties to the original suit in which the judgment was reversed either before or after reversal, and their rights are only such as can be enforced in an independent action.

It does not follow, and we do not hold, that one having a claim based upon a right of restitution for money paid can never recover such money by application of the principles of constructive trust, but a constructive trust cannot here be declared because there has been no tracing of the funds.

(d) Appellants finally urge that their claims are "inherently preferred." But preferences must be based upon recognized principles of law and equity. We are here dealing with an insolvent estate. There are other creditors with unsecured claims, and if preference be granted to appellants, the property of other creditors will be taken from them and given to appellants. The master and the administrative judge have both denied any preference to the claims of appellants. These findings, concurred in by both the master and the judge, will not ordinarily be disturbed by this court, unless based upon some erroneous theory of law or unsupported by substantial evidence. Equitable Casualty & Surety Co. v. Helena Wholesale Grocery Co. (C.C.A.8) 60 F.(2d) 380.

In the administration of estates of insolvents, courts attempt to observe among creditors that equality which is equity. Empire State Surety Co. v. Carroll County (C.C.A.8) 194 F. 593. The burden of proof was upon appellants to establish their alleged rights of priority. Hassall v. Wilcox, 130 U.S. 493, 9 S.Ct. 590, 32 L.Ed. 1001; Leo v. Pearce Stores Co. (D.C.) 54 F.(2d) 92; In re Dissolution of Field Body Corporation, 240 Mich. 28, 215 N.W. 6.

Appellants cite in support of their contention of inherent preference Love v. North American Co., supra, and Ex parte

Lincoln Gas & Elec. Co., 256 U.S. 512, 41 S.Ct. 558, 65 L.Ed. 1066, but the facts in those cases clearly distinguish them from the case at bar. In those cases the decision of the lower court upheld the legislative rate, and the excess charges were exacted under duress of a mere supersedeas order. Here, as has been observed, the court by decree adjudged the legislative rates to be void, and it was pursuant to this decree that the excess charges were collected. That decree was not void, though erroneous, and was in full force and effect until reversed by the Supreme Court. What is said by the Supreme Court in Lawrence v. St. Louis-San Francisco Railway Co., 278 U.S. 228, 49 S.Ct. 106, 107, 73 L.Ed. 282, is here pertinent. It is there said: "The District Court [30 F.(2d) 458] had, when it issued the injunction, jurisdiction of the parties and of the subject-matter; and it has never relinquished its jurisdiction. It is true that this court has held that the interlocutory decree was improvidently granted. But it did not declare that the decree was void. * * * The interlocutory injunction, until dissolved by our decision, was in full force and effect. The appellants refused to assume the risk attendant upon suspending the decree by means of a supersedeas bond. The appeal did not operate as a supersedeas."

The claim of inherent preference is, we think, answered by the opinion of Justice Brandeis in the Spiller Case, where it is said: "Preferential payment is urged also on the ground of public policy. The argument is that the carrier is invested through its franchise with a part of the sovereign power; that in the exercise of the power conferred the old company exacted illegal rates which the shipper was obliged by law to pay; that when the old company's property passed into the hands of the court it was augmented by the illegal exactions; that it became the court's duty to make restitution; and that, having failed to do so while the property was in its hands, the court may require payment from the new company. It may be assumed that this claim for overcharges is meritorious in character; but the fact that it arose many years before the appointment of the receivers is conclusive against including it among those entitled to preferential payment."

We conclude that the court correctly held that appellants were not entitled to preferential payment of their claims.

2. It is contended that the court erred in not holding the doctrine of omnia praesumuntur contra spoliatorem applicable, on the theory that the carrier should have preserved the waybills covering their shipments. As has been observed, the final decree in the rate case was in favor of the carrier. It was presumably correct and did not provide for the preservation of records or accounts for the benefit of those paying the charges, nor did it require a bond or a segregation of collections in excess of the statutory rates. The appellants were not parties to those proceedings. As no supersedeas bond was given on appeal, the decree became immediately effective. The requirement for preservation of the waybills which was embodied in the temporary injunction in the original suit merged in the final decree for permanent injunction. Houghton v. Cortelyou, 208 U.S. 149, 28 S.Ct. 234, 52 L.Ed. 432. The temporary injunctional order only required preserving the waybills pending the further hearing and determination of the case in the trial court, and in the absence of any further injunction or command, the destruction of the waybills after entry of final decree was not a violation of any order of the court.

Parties paying these freight charges were given a receipted expense bill which contained all the information necessary as the basis for a claim for overcharges and all the information that could possibly have been obtained from the waybills. There was printed on each expense bill a notice to the effect that it must be surrendered in support of the claims for overcharges. Referring to these expense bills, the lower court said:

"An expense bill made up from the waybill was issued to the person who actually paid the freight, and a duplicate of this expense bill was retained by the carrier in its files, so it is obvious that from the original documents delivered to the person who paid the freight, complete information and original evidence were in the hands of the person paying the overcharge, to establish the date of shipment, the commodity shipped, the weight of the car, the origin and destination of the haul, and the sum paid as freight. * * * In short, he who paid the freight got sufficient original evidence on which to establish his claim and make a prima facie case."

These expense bills, receipted and in the possession of the parties, were the best

evidence of the overcharges. Gallup v. Railway Co., 140 Ark. 347, 215 S.W. 586. If they were not retained by claimants, that was no fault of the carrier, and, certainly, equity should not visit upon the carrier a penalty for the destruction of the waybills when it had thus placed in the hands of the parties paying the charges the best obtainable evidence of the transaction, and particularly when the destruction took place under the circumstances here shown.

As has been observed, the special master found that there was no willful, intentional, or fraudulent destruction of records. The Interstate Commerce Commission permitted accumulated files of this character to be destroyed every five years. These were intrastate transactions, to be sure, but the normal procedure of the carrier was to follow the same uniform practice as to all its records. The waybills destroyed were from seven to nine years old, and the waybills from 1905 to 1908, inclusive, never came into the possession of the receiver nor of the new railway corporation purchasing the property. Waybills for 1909 and 1910 were destroyed by subordinates of the receiver after his appointment and after the sale. The waybills for 1905 to 1908 were destroyed by authority issued in 1914 and 1915, while those of 1909 and 1910 were destroyed by authority issued in 1916 and 1917. The master found that the destruction was by subordinates without order from the receiver or from the executive officers of the new corporation.

The finding of the master as to the absence of evil intent in the destruction of these records was approved by the court and supported by undisputed evidence. Having in mind the length of time this case and the rate case were pending in the courts, and the fact that the carrier had to transact its business by many different employees and agents, it may well have occurred that the waybills were destroyed as a routine matter without any intent or desire to destroy evidence, especially in view of the fact that the expense bills had been given to the shippers. The rule invoked can only be applied where there was intentional conduct indicating fraud and a desire to destroy, and thereby suppress, the truth. Mastin v. Noble (C.C.A. 8) 157 F. 506; Gallup v. Railway Co., supra. We are of the view that the court was right in refusing to apply the doctrine invoked.

3. By order of court entered July 3, 1916, claimants were required to file statements showing the nature, dates of accrual, and amounts of their respective claims and demands. The necessity for such information is thus stated by the administrative judge:

"Certainly, so much seems necessary in cases like these at bar, wherein experience has frequently shown, as the record before me discloses, that many of the claims were made by the shipper for overcharges on freight when the freight was actually paid by the consignee; where two or more claimants had asked for restitution of overcharges on the identical car; where the routing was actually interstate."

As illustrative of this situation, it is observed that the Berthold-Jennings claim in more than forty instances was based on a shipment of ties which carried a rate of $3\frac{3}{4}$ cents, but the evidence showed that the shipments were in fact lumber which took the statutory rate of 7 cents. Some of the general claims describe the commodity as grain or lumber, to which the statutory rates applied, while the proof showed them to be commodities to which the statutory rate did not apply. Some of the shipments were alleged to be intrastate, while the evidence showed them to be interstate. Then, too, there were many duplications of claims, and there were possibilities that both the shipper and the consignee were pressing the same claim. Fairness to the defendants, and a proper regard for an orderly procedure, to enable the court to dispose of its work, justified this order. As said in Universal Oil Products Co. v. Skelly Oil Co. (D.C.) 12 F. (2d) 271, 274: "As the demands upon the time of the courts have so greatly increased, the judicial tendency under the new rules seems to have been towards the requirement of greater certainty in pleading and full preliminary discovery of facts under the provisions of rule 58 [28 U.S.C.A. following section 723]."

These claims were presented in a court of equity, and equitable rules should prevail.

A number of other procedural details are presented. Those worthy of attention may be stated as follows: (1) Was it error to require the claimants to state their claims in detail; (2) was it error to restrict on amendment the amended petitions to the number of cars involved and

the total amount claimed in the original petitions?

Equity Rule 20 (28 U.S.C.A. following section 723) provides: "A further and better statement of the nature of the claim or defense, or further and better particulars of any matter stated in any pleading, may in any case be ordered, upon such terms, as to costs and otherwise, as may be just."

If the allegations of the bill are indefinite, a motion to make more certain is appropriate. McInnes v. American Surety Co. (C.C.A.8) 12 F.(2d) 212. A court, in its discretion, may properly require a more definite and certain statement of the bill, even though the bill may formally comply with the requirements of rule 25, that a bill contain "a short and simple statement of the ultimate facts upon which the plaintiff asks relief, omitting any mere statement of evidence." Universal Oil Products Co. v. Skelly Oil Co., supra.

Appellants had the burden of establishing their claims. Golo Slipper Co. v. Hamilton Shoe Stores Co. (C.C.A.10) 43 F.(2d) 33. We are asked to hold that because of a defect in proof, the trial court should have permitted a trial upon the general allegations of the claims, but the sufficiency of a bill is not, of course, to be determined by a consideration of whether the pleader will be able to establish his allegations. The ruling complained of was within the sound discretion of the court, and we cannot say that in so ruling the court abused its discretion. Howe v. Haterius (C.C.A.8) 66 F.(2d) 835.

The destruction of the records by the carrier or the receiver is urged as a persuasive reason for permitting the trial upon general allegations, but we have heretofore adverted to the fact that expense bills were furnished to every shipper, but for some reason appellants did not produce these bills which had been furnished them, and which armed them with competent and complete evidence upon which to base a claim of recovery. It must be remembered in considering the equities which the court was bound to consider that appellants have long delayed in pressing their claims. Stale claims are not favored. The mere filing of their suit did not relieve them from laches because not diligently prosecuted. Des Moines Union Ry. Co. v. Des Moines Terminal Ry. Co. (C.C.A.8) 52 F.(2d) 616; Willard v. Wood, 164 U.S. 502, 17 S.Ct. 176, 41 L.Ed. 531. True, mere lapse of time does not constitute laches, but appellees point out many difficulties due to the loss or disappearance of the carrier's station records, and records of shippers, consignees, and connecting lines, in presenting their defenses. Appellants did little, if anything, toward pressing their claims until 1925, when the court, apparently on its own initiative, entered an order for amended petitions. It is not contended that there is such laches here as to bar the allowance of the claims, but that the delay should be considered in determining the question whether the court properly required some degree of definiteness and certainty of allegation. Where, through delay, evidence has been lost or obscured, there exists such laches as to defeat a claim which otherwise might be enforceable, and courts of equity "often act upon their own inherent doctrine of discouraging, for the peace of society, antiquated demands, by refusing to interfere where there has been gross laches in prosecuting rights. * * * Length of time necessarily obscures all human evidence, and deprives parties of the means of ascertaining the nature of original transactions." Wagner v. Baird, 7 How. 234, 258, 12 L.Ed. 681.

In St. Paul, S. & T. Ry. Co. v. Sage (C.C.A.8) 49 F. 315, 325, it is said: "It is urged in argument that it does not appear that the lapse of time has put the defendant company or any one else at a disadvantage, and therefore there is no ground for applying the doctrine of laches. The lapse of time is almost certain to affect the evidence upon which the legal rights of the parties are dependent, and this is a sufficient reason for requiring diligence at the hands of a suitor in equity in all cases wherein it appears that delay may have put a party to a disadvantage in the procurement of material evidence."

See, also, Mackall v. Casilear, 137 U.S. 556, 11 S.Ct. 178, 34 L.Ed. 776; Brown v. County of Buena Vista, 95 U.S. 157, 25 L.Ed. 422.

While appellants delayed, the estate has passed through many complications and is now in bankruptcy.

In permitting appellants to present these stale claims, we think the court exercised a reasonable discretion in calling upon them for a clear and definite statement of the nature of the claims. Cer-

44

tainly, greater detail and certainty of pleading may reasonably be required of a suitor who has let his cause of action slumber for years, than of one who diligently and promptly presents it. This would seem peculiarly true in the case of a public carrier with its multiplicity of transactions and its numerous employees, and the many complexities. which may arise in ascertaining the proper charge to be made for its service. We are of the opinion that the court did not err in this ruling.

4. The ledgers of certain grain commission firms were shown to have been destroyed. Before their destruction, an accountant copied off a portion of the record entries respecting the cars in which he was interested, but failed to make a complete copy. In many instances a complete copy would have shown whether an interstate shipment was involved. Appellants contend that these copies were competent as a summary of voluminous records made by an expert. There is no basis for this contention. The books that had been destroyed were not the books of the carrier. They, of course, were not produced, but neither was there any evidence that would have made them competent if the originals had been produced. While, under certain limitations, an expert may give a summary of his examination of voluminous records, if proper foundation has been laid with reference to such records so as to make them competent evidence, still to be admissible the records must at least be produced and be made available to the opposite party for the purpose of cross-examination. Ordinarily, the rule is one of convenience which goes no further than to permit a summary of the mass of records otherwise in evidence, or at least admissible in evidence and actually produced in court. Lemon v. United States (C.C.A. 8) 164 F. 953; Davis v. Supreme Council of Royal Arcanum, 195 Mass. 402, 81 N. E. 294; 10 L.R.A.(N.S.) 722, 723, 11 Ann. Cas. 777; Dohmen Co. v. Niagara Fire Ins. Co., 96 Wis. 38, 71 N.W. 69; Stolz v. Scott, 28 Idaho 417, 154 P. 982; Wigmore (2d Ed.) § 1230; Jones on Evidence (2d Ed.) Vol. 2, p. 767. The proffered testimony was clearly hearsay and incompetent.

5. There was excluded from the claims or charges made on shipments moving from points in Missouri to St. Louis, Mo., those shipments which moved on the line east of the river and in the state of Illinois, on the theory that such traffic was interstate. It appears from the evidence that the carrier habitually routed certain traffic to St. Louis from points in Missouri along the east side of the Mississippi river. Such traffic was, of course, interstate commerce. The same rate applied whether the traffic moved interstate or intrastate. The practice was shown to have been uniform and well established and was embodied in a printed routing circular issued in 1911. In the absence of specific evidence, there was an inference that the shipments moved in accordance with established routing instructions and practice. Missouri Pacific R. Co. v. Stroud, 267 U. S. 404, 45 S.Ct. 243, 69 L.Ed. 683. Witnesses testified for the carrier that routings on these shipments from 1903 would have been on the east side of the Mississippi river. The custom being proved, an inference, rebuttable to be sure, arose that the custom was followed, and the court was correct in so holding. Security Mutual Life Ins. Co. v. Kleutsch (C.C.A.8) 169 F. 104; Wigmore on Evidence (2d Ed.) § 92.

6. It is finally urged that the court erred in applying tariff minimum carload weights in the absence of proof of actual weight. A witness for appellees testified as follows: "Carload minimum means weight on which charges will be assessed for a carload shipment, even though the car contains less than the minimum weight, but, of course, where the weight exceeds the minimum, charges are based on actual weight."

The evidence in many cases discloses the movement of the particular car without indicating the weight upon which the rate could be calculated. Under such circumstances, recovery was limited to the tariff minimum for a carload. It appears that in cases where shipments were made from stations having no track scales, the agent placed on bills of lading, under the column headed "Weight Subject to Correction," a fictitious and arbitrary weight, which was usually the weight stenciled on the car indicating its carrying capacity. These arbitrary weights placed on bills of lading at stations where there were no track scales were rejected by the master and the court as unreliable. This, we think, was not prejudicial. It was incum-

bent upon appellants to establish their damages with reasonable certainty. Compensatory damages cannot be determined by speculation and conjecture. The weight of these cars, unless the minimum be accepted, is purely speculative and conjectural, and under the evidence the appellants were not prejudiced by the holding that they might recover on the minimum weight.

The record as a whole indicates that the issues in this complicated and perplexing suit were all carefully considered both by the special master and the lower court, and we are impressed with the thought that no prejudicial error was committed in the trial of the suit, and the judgment appealed from is therefore affirmed.

STONE, Circuit Judge (dissenting in part).

I concur in all of the results announced in the excellent opinion of Judge GARDNER except in the matter of priority of the claims of appellants. I cannot escape the conclusion that these claims are entitled to priority over all secured as well as unsecured creditors. This priority rests upon a ground urged by appellants: that their claims are "inherently preferential" because of their character.

I am not here concerned with the procedure for establishment of these claims, but with the effective enforcement of such as may be properly established. It is not a matter of definition of substantive rights. There can be no doubt of the existence of the substantive right of these claimants (upon proper proof of claims) to recover these overcharges. Ex parte Lincoln Gas & Electric Light Co., 256 U.S. 512, 41 S. Ct. 558, 65 L.Ed. 1066; Arkadelphia Milling Co. v. St. Louis Southwestern Ry. Co., 249 U.S. 134, 145, 39 S.Ct. 237, 63 L.Ed. 517. It is a matter of equitable remedy to make the enforcement of this undoubted right effective.

Where the trial court in a rate case has required the difference in the rates to be impounded with the court or where it has required a bond protective of the rate payers (as in the Lincoln Gas Co. and Arkadelphia Milling Co. Cases, supra), the court has, in advance, provided for a remedy which is usually effective. Where, as here, no such provisions are made, the remedy must be sought other-

where. Such remedy is to be sought in proceedings for that purpose in the rate case subsequent to final decree upholding the disputed rate or, under some situations, by actions in other courts. The situation here is that, under the final decree on mandate in the rate case, such claimants were expressly given the choice of proceeding in the rate case or of resorting to other courts. They are now properly in a court of equity invoking the full equitable powers of that court not only to determine the verity of their claims, but to accord to them an equitable remedy of enforcement which will assure realization upon such claims. The insolvency of this company creates the importance of the remedy to assure realization and makes such depend upon the right of priority of payment over secured and unsecured creditors. The search is for such priority. If such priority exists, it must be for a sound legal reason. Priorities arise in three ways: By statute, by situations created by the parties themselves through contract or tort relations, and by courts of equity. There is here no governing statute and no situation created by contract or by tort of the interested parties. This entire situation was created by the court of equity which issued the injunction, and if priority exists, it must be found in the equity powers of the court in which the claims are pending.

My brethren have diligently examined those equitable powers and are unable to find any ground for priority which is of any practical avail to these claimants. They find that such claims are without the equitable rule as to priorities for labor or material furnished within six months; that they are outside the equitable rule governing constructive trusts ex maleficio; and that, if they might be within the equitable rule of constructive trusts, such is unavailing because the trust fund cannot be traced. With these three conclusions I agree. They ably discuss appellants' contention that the claims are "inherently preferred" and reject that contention as unsound on principle and also on authority. If either of these positions is correct, the matter is ended. It is because I am unable to see that either is sound that I am compelled to dissent and, respectfully, to state my views concerning each.

First as to authority, because if there is governing authority which directs our

steps, I am not at liberty to follow any other path. The authority relied on is St. Louis & S. F. R. Co. v. Spiller, 274 U.S. 304, and particularly the paragraph at page 311 of that opinion, 47 S.Ct. 635, 71 L.Ed. 1060, wherein the court discusses and disposes of the contention by Spiller that his claims were entitled to preference. "on the ground of public policy."

In so far as the matter which influences me to think these claims are preferential, I can discover no authority in the Spiller Case because it seems to me that case involved a different situation and a different ground for alleged preference—in short, entirely different issues. While I shall hereinafter try to state the reasons which impel me to think sound the ground for preference in the instant case, it is necessary here to state that ground in order to contrast the lack of application of the Spiller Case. That ground is where the proper legislative authority establishes a service rate and thereafter enforcement of that rate is suspended by a court of equity (in its discretion) at the instance of and for the sole benefit of the service company pending a determination of the validity of the new rate and the new rate is finally judicially sustained, the improper collections made by the company solely because of such suspension are preferentially payable before contract obligations of the company, secured or unsecured. The foundation concept is that no such creditors should equitably profit from such exactions so secured and that the only way to prevent such inequity is by allowance of such preference.

In the Spiller Case the situation was that the carrier has established a higher rate for live stock shipments. That rate became then the only legal existing rate which the carrier could charge or the shipper could pay. Complaining shippers paid that rate and later availed themselves of the remedy accorded by the Interstate Commerce Act to challenge the rate as unreasonable and to recover reparation ("damages" under the act) for the difference above a reasonable rate. Here, the state Legislature established a lower intrastate rate which then became the only legal rate the carrier could charge or the shipper pay. The carrier came into a court of equity to challenge the validity of that rate. It sought and obtained the exercise of the discretion of that court to protect it therefrom pending the liti-

gation. This was sought and obtained solely for its benefit and to the harm of the shippers. No provision was made by the court (which had the undoubted power) to protect the shippers against these exactions if the carrier failed in its suit. A court of equity—not only empowered but required to do full equity to all parties—and that court alone made the exactions possible and it alone gave the carrier the full benefit thereof. Therefore, the situation here is whether that court is powerless to right the loss which it alone caused. The situation in the Spiller Case was at most simply an unjust enrichment (often "assimilated to an obligation of contract," Texas & Pac. Ry. v. Pottorff, 291 U.S. 245, 261, 54 S.Ct. 416, 420, 78 L.Ed. 777), while here there was not only an unjust enrichment, but one caused solely by a court of equity which in that, as in all other matters before it, had the positive duty of employing all of its powers to do full equity to the shippers as well as to the carrier.

The issue in the Spiller Case as to "public policy" being a basis for preference is different from the basis for preference here present. There (274 U.S. 304, page 311, 47 S.Ct. 635, 71 L.Ed. 1060) the issue was whether the carrier having exacted illegal rates through the exercise of its "sovereign" power to fix rates and those exactions having passed into the property coming to the custody of the court through receivership, there then existed a duty to make restitution while the court held the property and, having failed so to do, the court could require payment from the company acquiring the property. Here the issue is whether a court of equity having solely caused an improper exaction which passed into the property has power to right that wrong. It seems to me there is such lack of similarity between the two situations and the two issues as to remove the Spiller Case as any authority here.

That these claims are rights recognized and enforceable by the courts of the United States is established. That they would, at the very least, be entitled to rank as unsecured claims is not challenged. The question is whether they are, because of their character, entitled to preference in the situation here. The majority opinion correctly states that the burden is on these claimants to establish a right to preference. There is no dispute that claims may be

of a character so to appeal to a court of equity that they will be accorded preference because thereof. Courts of equity have repeatedly considered the particular character of claims urging preference and where the circumstances surrounding such seemed to merit preference, have so determined. Instances thereof are found in constructive trusts, equitable assignments, equitable liens, receiver's certificates, and the six-month labor or material claims. The inquiry is whether the undisputed facts showing the character of these claims are sufficient to carry that burden —whether the circumstances surrounding them appeal to a court of equity as entitling them to preference.

In my judgment, the facts here should so appeal to a court of equity. The state Legislature established the reduced rates. They became the only legal rates. These claimants (as shippers) had a right to demand service at such rates and the carrier had no right to refuse. The carrier had the right to question the validity of those rates. The court resorted to by it had the power to protect the substantial rights of all parties pending the test. How it should exercise that power was a matter of sound discretion. The method employed here was to enjoin enforcement of the reduced rates and permit the rate difference to be collected and used by the carrier. This action was solely for the protection and benefit of the carrier. Final determination sustained the reduced rates. That determination settled that such rates were the only legal rates from their promulgation. The litigation had neither nullified nor changed them at any time. It had merely prevented their enforcement during and for the purposes of the suit. The shippers were entitled to return of the exactions made under the protection of the court's order and with interest from date of payment, Arkadelphia Case, supra, 249 U.S. 134, page 147, 39 S.Ct. 237, 63 L.Ed. 517. If an improper exaction made for the benefit of one party and to the damage of another solely by the orders of a court of equity does not appeal to all of the powers of a court of equity to right the wrong so caused, I do not know what would. It is within such powers to declare a preference if such be necessary to right the wrong. Obviously, this should be done unless prevented by opposed equities in the situation which prevent. Are such equities present?

If such counteracting equities exist, they must be found in the unsecured or secured creditors. No special circumstances or equities are here shown as to why any particular creditor (secured or unsecured) should have preference over or equality with these claimants. The situation is simply the general one of secured and unsecured creditors.

I think the record in this case rather strikingly illustrates the positive injustice which will ensue unless preference over all such creditors is accorded these claimants. These exactions passed into the treasury of the carrier. It makes no difference how they were there used for in any case they augmented what passed to the receiver by just that much either by preventing that much more indebtedness of some character or otherwise. There can be no doubt that all of the creditors have been benefited thereby just because the debtor carrier was so benefited. What greater right in equity and fair dealing have they to retain these compulsory payments than their debtor?

Moreover, it is quite obvious that this receivership proceeding was mainly caused by the situation brought about by the decision sustaining the state rate which meant a liability for return of the collected overcharges. The entire allegations of the bill upon which the receivership was initiated are not in the record, but there is one clause of quite evident importance which shows a number of claims amounting to more than a million dollars on account of overcharges in Missouri and a large amount of similar overcharge claims in Arkansas and the danger of a multiplicity of suits thereon and levies upon property of the carrier. It is further significant that this receivership lasted only about fourteen months until the final decree of sale. During this time, all of the liquidated personal injury claimants and practically all of the labor and material creditors had been paid in full so that the picture at time of reorganization included little more than the secured creditors, stockholders, and these rate overcharge claimants. The property was sold to a reorganized concern which consisted of the bondholders and stockholders of this company and of the Missouri Pacific Railway Company (which owned practically all of the Iron Mountain stock). In short, the secured creditors and the stockholders took over the property under a reorgani-

48

zation which accorded a subordinate place to the shipper claimants if their claims were without preference. Through these financial manipulations and judicial actions the complete picture is as follows: A state may fix a legal rate to be charged shippers; the carrier may contest that rate for years (here about nine years); during those years it may, under the protection of an injunctive order of a court of equity, improperly collect more than the established rate; it may pass those collections into its business and use them freely therein; if finally unsuccessful in the rate litigation, it may pass through a receivership resulting in a reorganization by the secured creditors and the stockholders; it may vigorously contest the return of these improper exactions and finally compel the shippers to accept subordinate securities in the reorganized company without a cent of cash return of the money improperly exacted from them. The net result of this situation is that the shippers have had taken from them more than a million dollars under the orders of a court of equity of the United States, and through the actions of another court of equity of the United States the only recompense they can secure is subordinate securities in a reorganization of the carrier after practically all of the general unsecured claims have been paid in full. Such results do not accord with my conception of the powers and duties of a court of equity of the United States.

It makes no difference that such preference cannot be brought under some one of the existing classes of 'equitable remedies which have been employed to work out justice through preferential payment. While courts are properly conservative and rightly seek to fit the enforcement of rights into established remedies, yet "a court of equity's modes of relief are not fixed and rigid. It can mold its remedies to meet the conditions with which it has to deal. The jurisdiction of equity is the whole domain of conscience, limited only by legislative enactment. The faculty of equity must be energetic, productive, and progressive. But to exercise this right of the court of equity there must be some show of an injustice attempted or about to be perpetrated upon the petitioners." Graselli Chemical Co. v. Ætna Explosives Co., 252 F. 456, 459 (C.C.A.2). To me, it seems sufficient if the situation of these claimants entitles them to preference. If so, the reorganized company is subject thereto because it took the property with the expressed condition in the order of sale that it would pay claims found to be so preferential.