Charles W. MOORE, Jr.,
Plaintiff-Respondent,

v.

GENERAL MOTORS CORPORATION, a corporation, Defendant-Appellant.

No. 37015.

Missouri Court of Appeals,
St. Louis District,
Division Three.

Aug. 16, 1977.

Motion for Rehearing and/or Transfer Denied Sept. 12, 1977.

Application to Transfer Denied Oct. 11, 1977.

Barnard & Baer, James E. McDaniel, Doris J. Banta, St. Louis, for appellant.

George R. Gerhard, St. Louis, for respondent.

KELLY, Presiding Judge.

## I.

In this case of first impression in Missouri the defendant, General Motors Corporation, appeals from a judgment of the Circuit Court of the City of St. Louis wherein the plaintiff, Charles W. Moore, Jr., was awarded $8,500.00 as damages by a jury for what the plaintiff contends was the failure of the defendant to pay him an amount of money to which he was entitled pursuant to the defendant's Employee Suggestion Plan.

At all relevant times the defendant had a Suggestion Plan (hereinafter referred to as the "Plan") which it promulgated to its employees and whereby it encouraged its employees to submit suggestions on forms identified as "Suggestion Forms" made available to them by the defendant. A "Suggestion," according to the Plan, was a "proposal to submit something in a specified manner." When a suggestion was submitted on the form provided for that purpose, the Plan stated that it was to be "systematically investigated for merit" so that a sound decision would be made whether it should be adopted, and was to be reviewed by the Suggestion Committee (hereinafter "Committee") made up of representatives of major departments of the defendant's plant. If a suggestion was not adopted the suggester was told the reason. Awards were to be paid after the suggestion was adopted and in effect.

According to the Plan, the function of the Committee was to decide (1) whether suggestions submitted to it were eligible for awards and (2) the amount of each award.

The Plan provided a formula for the making of awards which were adopted by the defendant. According to this formula, where the benefits resulting from a suggestion were *measurable* the award amount was to be one-sixth of the total gross savings to the division in which the employee worked during the twelve month period following adoption of the suggestion, up to a maximum award of $10,000.00. If a suggestion resulted in savings to the suggester's division but a loss in the same amount

to another division, the suggestion would be considered to have resulted in no savings and the amount of the award would be based upon *other benefits*. When a suggestion resulted in a saving of capital expenditure, the amount would equal one-twelfth of the total savings, but again subject to the maximum award of $10,000.00. Where there were *no measurable savings* resulting from an adopted suggestion, the award would be determined by the Committee "in light of all available information concerning its other benefits." All decisions by the Committee were final; however, if at any time an employee wished to reopen a suggestion to present new or additional information, the Committee, at its discretion, might review its decision.

## II.

Plaintiff, an employee of the defendant at its St. Louis plant in the body department since 1953, was, in 1971, working as a metal finisher repairman on the "night shift" or second shift, i. e. between 4:30 P.M. on one day to 1:30 A.M. the following. The suggestion—in actuality two suggestions—upon which he bases his claim in this case, was the result of some production problems the defendant was admittedly experiencing with a newly designed tail-gate—identified as a "clam" gate—it was installing on its 1971 model Chevrolet station wagons.

This new "clam" type tail-gate was constructed so that the bottom half, when in the open position, went down beneath the floor of the station wagon and the top portion—the glass part—ascended into the roof of the car. This design was to enable one to load or unload the rear of the station wagon from the rear while standing right up to the rear of the vehicle without the necessity of leaning over any part of the tail-gate while it was in the open position.

According to the evidence the 1971 model year commenced sometime in late August or early September of 1970; however, due to a strike no 1971 model station wagons were produced and shipped from the plant prior to or during the period covered by the strike, September 15 to November 23, 1970.

When production on the 1971 models resumed, production problems with the new tail-gates became evident. One problem was caused by the rear compartment floor pans for the station wagons being too long. This condition created a problem with the hanging of the tail-gates on the assembly line and the installation on the rear compartment floor pans of a weatherstrip retainer prior to the hanging of the tail-gate on the rear of the station wagon. The problem became so severe that the defendant had to set up a special rework group to cut the rear compartment floor pans down to the proper length before they were installed. The fabricator was notified of this problem and by January 15, 1971 it was corrected and the defendant disbanded the special rework group it had formed to cut them to the proper length. Nevertheless, rear compartment floor pans which were too long reappeared on occasion, and when they did, it became necessary to shorten them prior to installation or at other stages of production of the station wagons.

When rear compartment floor pans that were too long made their appearance subsequent to the disbanding of the special rework group, some were cut off or ground off to the proper length in the body shop prior to installation; nevertheless, some continued to escape detection and went through the production line until the end of the 1971 model year on July 27, 1971. When the weatherstripping was torn out by the lower portion of the tail-gate, repairs were effected in the Final Process Building (identified by some witnesses as "the mill" and by others as "wagon alley").

Although it was not a part of plaintiff's regular duties to hang tail-gates on the assembly line, as a repairman he had taken some tail-gates out, replaced some parts in them and reinstalled them. On one or two occasions he had repaired station wagons in

"the mill" and had observed a number of them in "wagon alley."

Sometime prior to May, 1971, he became aware of the problem of the raking-off of the weatherstripping on station wagons which he testified was due to a lack of clearance between the interior of the tail-gate and the weatherstrip retainer on the lower right side of the rear of the station wagons. He determined to remedy the problem. With permission of his immediate supervisors he made a tool or fixture out of two old body files after ascertaining that approximately a ⅝ inch clearance was required between the weatherstrip retainer and the interior of the lower portion of the tail-gate to permit it to be lowered and raised without raking off the weatherstripping.

The tool was made so that a small protuberance on one side of the fixture fit into a small hole in the skirt of the spare tire well located on the right side of the station wagon at the rear near the tail-gate. When the protuberance was placed in the hole in the spare tire well one end of the tool rested against a part of the auto body and the other end served to maintain the clearance needed between the interior of the lower portion of the tail-gate and the weatherstrip retainer so that the weatherstripping was not disturbed by the raising or lowering of the tail-gate. The fixture was put in place before the tail-gate was hung and was bracketed on the rear of the station wagon by hooking it over the crossbar and giving it a little pat so the protuberance would slip into the hole in the spare tire well.

According to the plaintiff, his original suggestion started being used by the defendant in early May, 1971, and on May 11, 1971, he submitted his suggestion on the form provided by the defendant for that purpose. According to this form his suggestion was:

" . . . to eliminate difficulty in fitting the wagon tail gate. I have made a small jig using files (old ones) brazed together, to keep the gate about ⅝ inch farther back while being adjusted tight. It has worked for 2 days and eliminated excess gate fitting down the line and in hold. It extends ⅝ inch behind retainer bar on right side, being held in place by hook on inside tire well. It is easy to install and handle but I would recommend a more permanent fixture be made of a smooth material, also made of aluminum or magnesium."

His supervisors, Charles Lance and Mack Alexander, directed that the tool be used on the second shift. Defendant has admitted that this tool was also used on the first shift for approximately 14 days, commencing with May 7, 1971.

In the meantime, the plaintiff took some measurements home and made a second fixture or tool out of some material he had at home, and when it was completed he brought it to the plant where it was used until the end of the model year. The defendant admits that this tool was used on the second shift from that time until the end of the model run, July, 1971.

When plaintiff's original suggestion was received by Mr. James D. Tisoto, the defendant's Suggestion Coordinator, he assigned an identification number to it and then forwarded an investigation inquiry to the superintendent of plaintiff's department, Mr. Jim Young. Mr. Young replied to this inquiry recommending adoption of the suggestion. His comment reads:

" . . . fixture keeps R/side of gate (at bottom) from pulling in too close to weather strip crossbar retainer at right corner where we have had a lot of trouble with rubber weatherstrip being pulled out of crossbar retainer. This fixture has cut down considerably on the number of jobs being knocked down for the condition existing."

Mr. Young's reply also advised that the suggestion was "In Effect" and he recommended an award of $300.00. Both he and Mr. Gene R. Poling, plaintiff's supervisor and foreman in charge of gate hangers on

the second shift at the time, signed the "Investigation Report" form.

Because the award recommended was in excess of $100.00, Mr. Tisoto also sent this suggestion to Mr. Frank Bloemke, the Senior Products Engineer of the Production Engineering Department for comments. Mr. Bloemke replied on July 1, 1971, recommending that the suggestion be declined because: "This defeats the purpose of T/gate hanging fixt., W/S. retainer clearance must be maintained by quality of R.C.P. flange and rear crossbar."

On the same date as Mr. Bloemke's reply, plaintiff submitted his second suggestion as follows:

" . . . I have made an improved fixture that will keep the required opening for wagon tailgates on all G. M. wagons, with the exception of Cadillac of course. It has worked for four weeks on second shift with 100% accuracy, even tho the rear assembly may be varying in lengths. One may even get any desired opening with it. Below is diagram.

\* \* \* \* \* \*

Gate openings cannot be right by an outside fixture due to different floor pan length."

On July 6, 1971, Mr. Tisoto forwarded the plaintiff's second suggestion to the Production Engineering Department for comment. However, before any reply was received from this inquiry, and while Mr. Tisoto was absent from the plant due to illness, the plaintiff, sometime in August, 1971, was advised that his suggestions had been declined. After he received this information plaintiff went to Mr. Tisoto's office and asked for reconsideration of his suggestions. When Mr. Tisoto returned to his office he learned what had taken place and because he felt inclined to award plaintiff something for his suggestions he consulted with Mr. Bloemke. Mr. Bloemke, however, persisted in his opinion that the suggestion should be declined. His reasons were that the suggestion was not a fixture; that it

was used only on the second shift, and, instead of doing rework before the tail-gate was hung, the body shop did this and therefore did not have a problem with the weatherstrip retainer. Nevertheless, he stated that they got a poor tail-gate fit, but nobody was looking at this, and the cars got through and the tail-gate fit had to be corrected further along the "system."

After talking with Mr. Bloemke, Mr. Tisoto, sent a letter to Mr. Young on or about August 30, 1971, advising him that the plaintiff had submitted a second suggestion and attaching copies of both suggestions to the letter. He also advised Mr. Young that both suggestions had been declined by the Production Engineering Department on the grounds stated by Mr. Bloemke. He also advised Mr. Young that plaintiff claimed that he had made the devices at the request of Mr. Lance and Mr. Wilson, that they were currently in use, and that it was his (Mr. Tisoto's) understanding that they were only used on the second shift for a few months and never on the first shift. Mr. Young was also advised of Mr. Bloemke's claim that although the tool resulted in a better fit for the weatherstripping, it resulted in a poor tail-gate fit which had to be corrected later on. The letter concluded: "Please confirm" and " . . . if there really was a manpower savings achieved which can be legitimately determined, please indicate."

On or about September 20, 1971, Mr. Lance, during the course of a conversation with Mr. Tisoto, told him that plaintiff's fixture put the tail-gate out even with the quarter-panel at the bottom, that he had been using 3, 4 and 5 gate fitters in the yard every night and the fixture cut repairs on the "item" at least in half or more and that he felt it "saved at least a full man." He also confirmed that Mr. Moore made the fixture at his supervisor's request and denied that it caused a poor tail-gate fit as claimed by Mr. Bloemke. He recommended an award of "at least $500.00 or more." Mr. Lance testified during the defendant's

case that while he was familiar with plaintiff's first suggestion he was not familiar with the second suggestion and had never seen this second suggestion in operation "on the line" at anytime between May and July of 1971.

The Committee met on September 21, 1971, to reconsider plaintiff's suggestions. Prior to attending the committee meeting, Mr. Tisoto and Mr. Carl Barth, another Committee member, went to the assembly line (during the first shift) to view the plaintiff's suggestion which was not then in use on the 1972 models. Mr. Del Turley, one of the foremen on that shift in the body shop, located one of plaintiff's original tools and demonstrated how it was used. Although Mr. Tisoto was present he did not observe the demonstration because his attention was distracted [by another employee who came up and engaged him in conversation concerning another matter]. Mr. Barth did observe how the tool was used in the station wagon. Both Mr. Tisoto and Mr. Barth discussed plaintiff's first tool with Mack Alexander and Jim Young on the line to learn something about it.

The Committee, at its meeting, considered what award to make and in doing so decided that the award was to be arrived at "in light of all available information concerning its other benefits," the alternative formula provided for by the Plan were the benefits enjoyed by the defendant were not measurable. The Committee adopted the recommendation of plaintiff's supervisors and foremen and awarded plaintiff $500.00. Plaintiff refused to accept the award and instituted this suit on August 23, 1972.[1]

Plaintiff's petition, as amended, alleged, among other things, that relying on defendant's suggestion plan and the monetary reward promised therein, he developed and manufactured a metal device or tool which, when used in hanging tail-gates on all station wagons produced by the defendant, with the exception of Cadillacs, eliminated any difficulty or delay in such hanging operation and the production of station wagons with defective tail-gates.

Plaintiff further alleged that he suggested that floor pans for such station wagons be cut to a standard length prior to assembly, and that pursuant to the suggestion plan he wrote up and described the metal device or tool he developed and manufactured, together with his suggestion as to floor pan lengths, submitted it to the defendant in the manner prescribed by the defendant; that these suggestions were used by the defendant in the manufacture of its station wagons; that he has repeatedly made demand for the monetary reward promised by the defendant in its suggestion plan, but that the defendant has failed and refused to pay plaintiff the monetary reward; that in making his suggestions he relied on defendant's promise of a $10,-000.00 monetary award, but that defendant has refused to pay him the award. Plaintiff prayed judgment in the amount of $10,-000.00.

Defendant's Answer, after admitting its corporate status, the nature of its business, plaintiff's employment, and the existence of the Suggestion Plan, denied each and every allegation of plaintiff's petition.

### III.

On appeal the defendant relies on two points for reversal of the trial court judgment. These are that the trial court erred:

1) in submitting the case to the jury because there is no evidence that the Committee in making its determination that there was no measurable savings of money to the defendant by the use of plaintiff's suggestion was guilty of bad faith or gross mistake, and

---

1. The petition as originally filed was in two counts. Count 2 sounded in quantum meruit and the cause was removed to federal court where plaintiff dismissed his second count and the cause was remanded to the Circuit Court of the City of St. Louis where it was tried on Count 1 of the petition, as amended.

2) in entering judgment in the amount of $8,500.00 because there is no evidence that the defendant realized savings in the amount of $51,000.00, which, according to Instruction No. 6 was necessary to authorize an award in that amount.

## IV.

Decisions on the respective rights and liabilities of an employer and an employee arising under employee suggestion plans are few. However, the parties to this appeal proceeded on the theory that when an employee submits a suggestion in response to a Suggestion Plan and the employer makes use of the suggestion in his business a contract comes into existence. Both parties cite *Carlini v. United States Rubber Co.*, 8 Mich.App. 501, 154 N.W.2d 595 (1967), which adopted this theory for the courts of the State of Michigan.[2] For those interested in the results reached by other courts considering this question, see: Anno. 40 A.L.R.3d 1416. Neither party has cited any decisions of the appellate courts of this State which have considered this question and our independent research has led us to

none. In *Wiles v. Union Wire Rope Corporation*, 134 F.Supp. 299 (W.D.Mo.1955) the trial court dismissed without prejudice an employee's amended complaint which failed to allege any agreement, express or implied, for compensation for use of an employee's discovery, holding that the complaint failed to state a cause of action in quantum meruit. *Wiles* can be distinguished because there was no promise of compensation by the employer if the suggestion was put into use, and furthermore, the trial court there also found that "shop rights" barred recovery where the discovery was made by the employee in the shop while working for the employer and was revealed to him without any express or implied agreement for compensation.

■ Plaintiff submitted his claim on a breach of contract theory pursuant to *Carlini v. United States Rubber Co., supra*. To recover under that theory it became incumbent upon him to establish from the evidence that the Committee in arriving at its award was "grossly mistaken" or "failed to use good faith."[3] He defined the term "grossly mistaken" in Instruction No. 4—his verdict-director—as a "mistake that is glar-

---

**2.** There is a split of authority relative to these Plans. *Carlini*, supra, supports a breach of contract theory. *Schott v. Westinghouse Electric Corp.*, 436 Pa. 279, 259 A.2d 443, 40 A.L. R.3d 1404 (1969) authorized a recovery under a theory of unjust enrichment where the employee's suggestion had been rejected but was subsequently used by the employer. *Grepke v. General Electric Co.*, 280 F.2d 508 (7th Cir. 1960), cert. den., 364 U.S. 899, 81 S.Ct. 232, 5 L.Ed.2d 193, allowed recovery on a theory of appropriation of a property right. See also *Rogensues v. Chrysler Corp.*, 24 Mich.App. 590, 180 N.W.2d 473 (1970); *Raybestos-Manhattan, Inc. v. Rowland*, 460 F.2d 697 (4th Cir. 1972) and *Osborn v. Boeing Airplane Company*, 309 F.2d 99 (9th Cir. 1962). *Calkins v. Boeing Company*, 8 Wash.App. 347, 506 P.2d 329 (1973), on the other hand, held that a Plan similar to the one here under consideration was "illusory" and no enforceable agreement for payment for the employee's suggestion existed between the parties and the employee could not therefore recover for the use of his suggestions by the employer.

**3.** The court in *Carlini*, supra, analogized the employer-employee suggestion plan with those

cases ruling on prize-winning contest litigation and contest rules making the decisions of the contest judges final and conclusive except where there is fraud, gross mistake, lack of good faith or an attempt to change the announced rules of the contest. This same provision that the award of the suggestion committee is conclusive on the suggester, the *Carlini* Court held, 154 N.W.2d 597, referred to decisions made pursuant to the established rules and did not give the Committee arbitrary power to set the award to be given to the employee, nor discretionary power to reject a suggestion that is ultimately put into use. It held that the proper function of the Committee was to make decisions within the framework of the rules of the Plan and if it did not do so, "or if its decisions are based on gross or palpable mistake, the plaintiff becomes entitled to relief for breach of contract." As we construe plaintiff's theory of the case it does not rely on any contention that the Committee did not make its decision within the framework of the Plan, but rather, that in applying the improper formula as provided for in the Plan, it was "grossly mistaken" or "failed to use good faith." Although we have searched plaintiff's petition we see no specific allegation of fraud, gross mis-

ingly noticeable." Defendant has not challenged that definition.[4] The issue to be resolved in disposing of defendant's first Point is whether plaintiff adduced sufficient evidence that defendant's use of his suggestions resulted in a benefit which was measurable, i. e. whether the defendant realized a gross savings to the division in which the employee worked. In deciding this issue, i. e., whether a submissible case was made and whether the trial court erred in not sustaining the defendant's motion for directed verdict at the close of all of the evidence, plaintiff must be given the benefit of any and all reasonable inferences which can be drawn from the evidence and which are not in conflict with his theory of the case, and defendant's evidence must be disregarded unless it aids plaintiff's case. *Kaelin v. Nuelle*, 537 S.W.2d 226, 232[6] (Mo.App.1976).

In undertaking to dispose of this Point we take note of the concessions of the defendant that it "made some use of plaintiff's fixture or tool for a few weeks in 1971;" that this period was between May 7, 1971 and July 27, 1971, and that should the judgment of the trial court be reversed, the judgment for the plaintiff in the amount of $500.00, which defendant has tendered into court, should be ordered. We also conclude that it is conceded by the defendant, from its own evidence, that the new "clam" type tail-gate created for the 1971 Chevrolet station wagon caused serious production problems.

Plaintiff's evidence was presented through the testimony of the plaintiff himself and six fellow employees: Edward A. Gregory, Burrell Nations, Virgil Moore, Alvie Tucker and Howard Jenkins.

Plaintiff testified that there was a twofold problem with the new clam-type tailgate: 1) the hang fixture in use securely fastened only the top portion of the tailgate to the back part of the station wagon and left the bottom portion "more or less haphazard," and 2) the weatherstripping was being torn off when the lower portion of the tail-gate was raised because there was insufficient clearance between the weatherstrip retainer on the bottom right side of the station wagon. He conceded that the sole purpose of his two suggestions was to maintain the required clearance between the weatherstrip retainer and the interior of the lower portion of the tail-gate as it was raised and lowered so that the weatherstripping would not be raked off. We conclude from the evidence that the problem plaintiff's suggestions were meant to obviate was the direct result of rear compartment floor pans which were too long and therefore had to be cut down to size; there is no evidence to support any other conclusion. While he testified in detail the labor involved in repairing a tail-gate where the weatherstripping was torn off by the tail-gate when it was raised with insufficient clearance, no evidence was adduced as to the amount of time consumed in these operations.

Mr. Gregory's testimony was that he was an inspector in the body shop whose job required that he mark-up "dings" and "high spots" sustained by parts in the course of shipment as well as "door-fits." Part of his job was involved with passenger safety and with weatherstripping, which was required by "Federal Motor Vehicle Standards" to seal the tail-gate to the back compartment and keep out carbon monoxide gas, dust

---

take, nor failure to use good faith; nevertheless, the parties tried the case on the theory announced in *Carlini* and we shall dispose of it on those grounds.

**4.** For other definitions of the term "gross mistake" see *People's United States Bank v. Gilson et al.*, 161 F. 286 (8th Cir. 1908); *McMichael v. Webster*, 54 N.J.Eq. 478, 35 A. 663, 666 (1896); *Malone v. Gates*, 87 Mich. 332, 49 N.W. 638,

639 (1891); *United States v. Hangar One, Inc.*, 406 F.Supp. 60, 64[1] (N.D.Ala.1975) was concerned with "Fraud or such gross mistakes as amount to fraud." And see *City of San Antonio v. McKenzie Const. Co.*, 136 Tex. 315, 150 S.W.2d 989, 996[13] (1941), where the decision of an engineer-arbitrator was under attack, for what is not "fraud, misconduct, or gross mistake."

and moisture. He was to make sure the weatherstripping was properly installed before any automobile was shipped to the dealers. It was very seldom, according to his testimony, they got a station wagon which did not have the weatherstripping raked off. He estimated initially that at least 99% of the station wagons had to be refit because of problems with the weatherstripping but on cross-examination he reduced this estimate to 60%. Sixty-four station wagons were produced per day, and although they were having this weatherstripping problem they were permitted to go on through the assembly line and then held up for repairs in "wagon alley." He worked overtime between February and July, 1971, whenever his seniority entitled him to, but he did not put in overtime every month and he did not testify that his overtime was repairing weatherstripping or hanging tail-gates. On several occasions he did go to "wagon alley" where he observed employees refitting tail-gates. According to this witness, plaintiff's suggestion eliminated the problem of raking off the weatherstripping because of lack of clearance.

Burrell L. Nations, hung tail-gates in 1971. He described the operation of hanging tail-gates and between February and July, 1971, he worked overtime every night and worked only on station wagons refitting tail-gates. He also observed other employees working on the retaining strip of the tail-gates during this time, and estimated at least 20 to 25 in the Group in which he worked also worked overtime. His 1971 income from overtime work on "defective tail-gates on station wagons" was $2,000 to $3,000 more than he earned in either 1970 or 1972. After plaintiff's suggestion was put into use his overtime stopped and he did not get to go back to the "mill."

Virgil Moore (unrelated to the plaintiff), a repairman in the body shop on the second shift, actually worked in the trim shop where the weatherstripping was installed. He too testified that after plaintiff's suggestions were put into use there was clearance and the weatherstripping did not tear out. During 1971 he worked in the "mill" area on *defective* clam-type tail-gates and while so employed observed station wagons where the weatherstripping was torn out of the retaining slot. When this happened it was quite a job moving the tail-gate back in the "mill." Between February and July, 1971, he worked seven days a week, thirteen to thirteen and a-half hours a day. "Roughly 90%" of this was repair work on station wagon tail-gates in the "mill" area. Although he was assigned there to work mostly on weatherstripping, he did occasionally work on something else. When asked, on cross-examination, whether his 90% estimate referred to tail-gates in general, regardless of what the fit problem was, he replied:

"A. When your tail-gate doesn't fit, it automatically tears-up your weatherstripping on that particular model. It would hit it coming-up or going down, or when you pull it up it would go in and hit the tail-gate."

He further testified that when the tail-gate was hard to close, "they" would throw this down and it would by-pass the plastic rollers, and when this occurred the channels also had to be repaired. He had seen weatherstripping torn on both the right and the left side of the station wagons. In 1971 he earned approximately $15,500; in 1972, $8,900. The difference in earnings resulted from the overtime he worked in 1971. When he worked overtime seven men from his shift worked with him as did fifty or sixty from the trim shop and ten painters.

Robert McGuire, a body man who worked on bodies after they had been assembled and painted, testified that "wagon alley" was large enough to accommodate 12 to 15 cars simultaneously. When a station wagon was in "wagon alley" there would be a team of trimmers and body men doing whatever work "was needed to be done." When he was employed in "wagon alley" he worked on "defective tail-gates" on station wagons doing whatever was required to be

done, but he did not do the same work on each station wagon he worked on. What he did depended upon the problem involved. He frequently saw a station wagon with the weatherstripping torn out. The tail-gates which were not operating properly "in or out" created quite a problem. If they were "in" too far, when you raised the tail-gate the weatherstripping would be torn out; if they were "out" too far, air would come in the top. Although during 1971 he worked overtime repairing "defective tail-gates" which involved "torn weatherstripping and bad fits . . .," he could not give an estimate of the average amount of overtime spent working on defective tail-gates due to the tearing out of the weatherstripping. He testified that repair of a station wagon tail-gate could take from 15 minutes up to 6 hours, depending upon the nature of the repairs.

On cross-examination this witness testified that his overtime work in the "mill" was confined to passenger cars and that he infrequently had occasion to remove the weatherstrip retainer in repairing a tail-gate. He did have a problem with the flush condition of the exterior part of the tail-gate and the quarter-panel which was caused by the striker being "in or out" when it engaged the lock. To the best of his recollection he never encountered a condition involving the space between the weatherstrip retainer and the tail-gate at the right hand bottom, nor with rear compartment pans which were stamped too long.

Alvie G. Tucker, a body metal finisher who was working on repair, saw a few station wagons where the weatherstripping was torn off while he was working in the "mill" helping fix tail-gates. He worked on "damaged tail-gates" and while doing so was assisted by a gate-hanger. Most of his time was spent in the "mill" where he worked 12 to 13 hours a day, 6 days a week. When he worked in the "mill" he never worked on anything having to do with weatherstripping in front of the tail-gate itself. His work involved the loosening of bolts. He did not spend all of his time in the "hold" or in the "yard" repairing station wagon tail-gates.

Howard Jenkins, a relief inspector in the body shop, testified that the problem with the clearance between the weatherstrip retainer and the tail-gate occurred so frequently that " . . . they got so many of them in the hold they was throwing them out of the hold. When they got too many, they put them out in the 'yard.' "[5] He never worked in "wagon alley;" his job was purely inspecting. He did not know whether, after plaintiff's suggestions were put into use, the weatherstripping problem was solved; all he knew was that in the body shop "the gates were coming better." His primary concern in the performance of his duties as an inspector was the space between the tail-gate and the weatherstrip retainer before the weatherstripping was installed.

Defendant's evidence which was most favorable to the plaintiff in addition to those previously mentioned hereinabove, included the testimony of Charles Lance that even after the rework group was disbanded there would occasionally be a three or four hour period—"a run"—when rear compartment pans which were too long did appear. When this happened, they were sheared off with a Quackenbush cutter in the cowl department of the body shop. It was only when the rear compartment pan was too long that the clearance problem developed. He gave as his opinion that plaintiff's first suggestion helped this condition, and although he saw the first suggestion in use, he denied that he ever saw plaintiff's second suggestion in operation on the line

---

5. The "hold," so far as we can discern from the record, was an area near the department involved where vehicles in the assembly line needing repairs were taken off the line and held pending repair. The "yard," on the other hand, was an area where vehicles were held when the "hold" or "wagon alley" were full.

at any time. He also opined that plaintiff's tool "saved the amount of work of one man." He knew the tool helped him in the body shop.

Frank Bloemke, Senior Production Engineer, testified that he had discussed plaintiff's first tool with Mr. Poling and Mr. Lance, plaintiff's superiors, and that they told him that they felt the tool "was doing a job in that area," and that despite his recommendation that it not be adopted, they continued using it on the second shift.

Mr. Tisoto, during the defendant's case, testified that a gatehanger earned $4.00 to $5.00 an hour for a 40 hour week, or a total of $800.00 for four weeks, or a total of $2,400 for a three month period.[6]

## V.

▆ We now consider whether plaintiff adduced sufficient evidence that defendant's use of his suggestions resulted in a benefit which was measurable. The term "measurable" has been defined as: "1a. capable of being measured. b. great enough to be worth consideration." And the term "saving" has been defined as: "the act or instance of economizing." *Webster's Third New International Dictionary.* The Plan contains no definition of these terms, so we must assume that these terms were intended to be employed in their common and ordinary meaning.

We conclude from the foregoing evidence, and the reasonable inferences to be derived therefrom, there was sufficient substantial evidence for the jury to find that the defendant did put into use plaintiff's suggestions between May 7, 1971, and July 27, 1971, for the purpose of affording the requisite clearance between the weatherstrip retainer and the interior of the station wagon tail-gates on the 1971 models. We

also believe that the jury could have found that plaintiff's tools provided the space required during that period, otherwise the defendant would not have continued to use them. Both plaintiff's evidence as well as defendant's evidence was to the effect that plaintiff's tools saved "at least a full man," and we believe from the evidence that the jury could find that the "full man" they are talking about was a repairman from the body shop since it was the supervisors and the foreman of that shop who made this report to the Suggestion Co-ordinator, Mr. Tisoto, in response to his inquiries. However, there is no evidence in the record concerning the earnings of a body repairman from which that saving can be arrived at. The only testimony relative to wages was that of Mr. Tisoto and he testified concerning the wages of a gate-hanger.

Nevertheless, we believe that from the evidence the jury could reasonably conclude that when the weatherstripping was torn out of the weatherstrip retainer because of the lack of clearance between the weatherstrip retainer and the interior of the lower portion of the tail-gate, it was necessary to remove the tail-gate, replace the weatherstripping, and then rehang the tail-gate. The evidence was that this was a time-consuming job and required a number of repairmen, trimmers and a gate-hanger to correct this problem.

Plaintiff's evidence was that 8 station wagons were produced each hour or each shift; or a total of 128 per day, since the plant was working two shifts a day. The evidence concerning the number of station wagons with raked-off weatherstripping which had to be repaired is not clear, and this is due to the fact plaintiff's evidence failed to distinguish between those station wagons which had the problem with the clearance between the weatherstrip retain-

---

6. Although plaintiff had marked as Exhibit # 11 the collective bargaining agreement between Fischer Body St. Louis Plant G.M.C. and Local No. 25 United Auto Workers of November 19, 1970, and used it in direct-examination of Mr. Moore, the plaintiff, with reference to

equalization overtime records, the Exhibit was never received into evidence. Wage rates contracted for in the agreement for the employees of the defendant set out between pages 39 and 44 of said agreement cannot therefore be considered by this court.

er and the interior of the lower portion of the tail-gate from those which had other problems. The term "defective tail-gates" was used indiscriminately both by plaintiff's counsel and the witnesses. Plaintiff's evidence too was that the 1971 station wagons had problems other than the raking off of the weatherstripping which had to be repaired in "wagon alley."

Much of plaintiff's case hinges on the amount of overtime put in by defendant's employees; however, here he fails to distinguish between overtime spent on repairing the particular problem his tools were meant to correct and other problems with the installation of the tail-gates which resulted from improper hanging, etc. One witness testified that once plaintiff's tools were put into use his overtime stopped altogether. Another witness testified he put in overtime until the end of the model year on July 27, 1971. If plaintiff's tools stopped the clearance problem then it is apparent that any overtime spent after they were put into use—at least after those station wagons which had been produced prior to the tools' employment had been corrected—could not have been spent in the repair of weatherstripping raked off because of the lack of clearance between the retainer strip and the interior of the tail-gate. Necessarily those repairs had to be because of some other problem disassociated with the problem plaintiff's tools were intended to correct.

■ We conclude that although the evidence is uncontradicted that the defendant put into use plaintiff's suggestions on its assembly line in the body shop to correct or maintain the proper clearance between the weatherstrip retainer and the interior of the lower portion of the 1971 Chevrolet station wagon tail-gate and thereby either totally eliminated this problem or certainly

reduced it on the second shift at least, his evidence falls far short of proving that the defendant enjoyed "measurable benefits" therefrom. Plaintiff's evidence on over-time does not pin-point nor circumstantially establish that the over-time was attributable to the weatherstripping problem with any certainty but rather leaves it to the jury to speculate on that point. We hold that plaintiff failed to produce substantial evidence that defendant was benefitted measurably by the use of plaintiff's suggestions.

### VI.

We believe that the plaintiff was cognizant that the evidence he adduced at trial was subject to defendant's attack that he did not make a submissible case and that this is best evidenced by his response both in his brief and oral argument in this court to that attack. The thrust of his argument on appeal is that he was deprived of record evidence which would have aided him in meeting his burden on the issue whether defendant was the recipient of benefits which were measurable. This, he argues, entitles him to the application of the doctrine of "spoliation, destruction or suppression of documentary or physical evidence." [7]

The basis for the application of this legal maxim, according to the plaintiff, is that this suit was filed on August 23, 1972; that on September 23, 1972, it was removed to the federal court and therefore the defendant had notice of the plaintiff's claim by that date if not earlier. Certain records, which he argues would have helped him establish his case, were destroyed by the defendant thereafter, and therefore he is entitled to the presumption that the evidence which has been destroyed would establish his demand to be just. Alternatively, he argues, if these records were not destroyed,

---

7. We are not called upon to decide—and we do not decide—whether the defendant impliedly was burdened with the requirement that it establish or maintain a record-keeping system under the terms of the Plan whereby either it

or plaintiff or any other employee participating in the Plan could ascertain whether the defendant enjoyed any measurable benefit by use of a suggestion submitted pursuant to the terms of the Plan.

they were suppressed and either of these circumstances entitles him to a finding of "bad faith" on the part of the defendant and the Committee.

The defendant replies to this argument contending that there is no evidence that it ever possessed any records which would have shown measurable savings by use of plaintiff's suggestions and therefore the doctrine of spoliation is inapplicable.

▇ Missouri, since *Pomeroy v. Benton,* 77 Mo. 64 (1882), has followed the spoliation rule that the destruction of written evidence without a satisfactory explanation gives rise to an inference unfavorable to the spoliator, and he who destroys such evidence is thereby held to admit the truth of the allegations of the opposing party. As recently as *Brissette v. Milner Chevrolet,* 479 S.W.2d 176, 182–3[9–10] (Mo.App. 1972), the rule has been discussed. The application of the rule is however, limited to those cases where there is evidence of an intentional destruction of the evidence indicating fraud and a desire to suppress the truth. *Berthold-Jennings Lumber Co. v. St. Louis, I. M. & S. Ry. Co.,* 80 F.2d 32 (8th Cir. 1936), 102 A.L.R. 688, certiorari denied, 297 U.S. 715, 56 S.Ct. 591, 80 L.Ed. 1001.

Records referred to during the course of trial included overtime equalization records, inspection records (also referred to as inspection tickets), payroll records, time cards, salvage records, and time studies. None of these were produced at trial by either party although testimony relative to their contents came into the record, and oftentimes said testimony was in conflict, dependent upon whether plaintiff or defendant adduced the evidence. The plaintiff contends that at least some of these records would have entries of the time spent as well as the number of tail-gates which had to be repaired by reason of the lack of clearance between the weatherstrip retainer and the interior of the tail-gate which resulted in the tearing off of the weatherstripping. Defendant, on the other hand, offered evidence that none of these records would contain that information. The issue to be decided is whether, on the basis of the evidence, plaintiff is entitled to the benefit of the spoliation doctrine.

Overtime equalization records were records required to be kept pursuant to the collective bargaining contract with the Union so that the overtime worked by any employee would be posted to assure that overtime was equitably distributed among the employees of the various departments. The only witness who testified that this record would reflect the overtime money spent "on repair of tail-gates on stationwagons in 1971," was Edward A. Gregory. Defendant's evidence was that these records were systematically destroyed at the end of the model year and for that reason were not available at trial time. Mr. Tisoto also testified, during defendant's case, that during the course of his investigation to ascertain the amount of award to be made to plaintiff after his suggestions were being reconsidered he was told that the overtime equalization records had been "pitched out."

While "payroll records" were referred to and it was established that they would show the amount of overtime worked, there was no evidence that they would show how much of that overtime was spent repairing station wagons with the problem plaintiff's suggestions were used to correct.

Inspection Tickets (or inspection records) are tickets which are made by an inspector when he "knocks-down" a vehicle for some repair. Although no one testified in detail what these records contain and no samples of such records were produced by either party, Mr. Gregory testified that an inspection ticket would show what was wrong with a car, e. g. "gate fit," and served the purpose of a quality control device, so that when an item showed up on the tickets frequently "they" would come back to the foreman of the department involved to find out why. According to this witness these records are required by the "Federal Motor Safety Standards Act" to be kept for every

vehicle in the sequence as it is manufactured for a period of five years and they are kept on microfilm. According to Robert McGuire, these tickets would show what repair work was to be done but not how much overtime or work time was consumed in making the required repairs. He testified ". . . when we get a repair job we look at the repair ticket, we repair the items noted as defective by the inspector, and I know we were all involved in tail-gates."

During defendant's case Mr. Lance testified that there is an inspection ticket for every body produced. Mr. Hare, who was General Foreman of Inspection, testified that inspection tickets were retained for the current model year plus two years, but that the tickets for the period covered in this case had been disposed of. He was not asked nor did he testify when this occurred. They would indicate what defects were written-up, that they had been repaired, and that the inspector "bought it off," i. e. passed the car for inspection. He denied that the ticket would show the length of time consumed in repairing the defects entered on the ticket. He confirmed the fact that the period these tickets were required to be maintained was regulated by the federal government.

Mr. Gregory testified that time studies were made by assembly experts to see if an employee could do more work or if the number of men performing a particular function could be reduced and the same work performed by a fewer number. From these studies, he testified, the cost of hanging a tail-gate could be determined. These studies were performed by the Industrial Engineering Department according to Mr. Tisoto for the purpose of determining the time it takes an employee to do a certain function in the production of a car. According to Mr. Carl E. Barth, the department in which he is employed as a methods analyst conducts these "time studies whenever the circumstances dictate that they be done." Among the circumstances which might give rise to time studies are: 1) the beginning of each model year where there would be an operation which was different from the preceding year and a time study is made of the operation to bring files up to date, and 2) to ascertain the amount of time required to perform any function of work and thereby assist in setting up regroup operations to take into account time values. He testified that in October, 1971, a time study had been made on the tail-gate hanging operation but it did not encompass adjusting, refitting and repairing of tail-gates.

Production records are those records which show the number of station wagons produced in an hour. When asked, Mr. Tisoto testified that somewhere, someone should have a copy of what defendant's production was during 1971.

Plaintiff relies on *State ex rel. St. Louis County Transit Company v. Walsh*, 327 S.W.2d 713 (Mo.App.1959) where the court, in a prohibition proceeding where the question was whether certain photographs taken by the operator of relator's motor bus at the scene of an accident was subject to discovery, and whether they were, depended upon why they were taken. The spoliation question came into the case because at the taking of the bus operator's deposition when he was asked why the photographs were taken, whether relator had instructed him to take them, or whether it was part of his duty to take them, the relator's counsel instructed him not to answer the questions. The court, 327 S.W.2d l. c. 717 said:

"The question as to why the photographs were taken was a question of fact, to be determined by the respondent. In his return respondent pleads that because the relator suppressed the evidence as to the reason the pictures were taken he indulged the presumption that the evidence, if not suppressed, would have been favorable to the plaintiff and would have revealed that the photographs were in fact not privileged. We are of the opinion that under the circumstances of this

case the respondent was entitled to indulge such a presumption, and to reach the conclusion that the photographs were taken for a reason which would not make them privileged. It has long been the rule in this state that the *spoliation or suppression of evidence gives rise to an unfavorable inference. Thus the destruction of written evidence without a satisfactory explanation gives rise to an unfavorable inference.* . . . Similarly, where one party has obtained possession of physical evidence which he fails to produce or account for at the trial, an inference is warranted against that party. . . . And where one conceals or suppresses evidence such action warrants an unfavorable inference, . . . , and evidence of such suppression is . . . admissible as showing an admission that defendant was conscious of being in the wrong and that its cause was unjust." (emphasis supplied).

■ Defendant's overtime equalization records, according to all of the evidence in this case, were destroyed in accord with defendant's policy to destroy them at the end of the model year, July 27, 1971; exactly when they had been was not put into evidence other than Mr. Tisoto's testimony that he had been told they had been "pitched out" while he was investigating plaintiff's suggestion prior to the Committee meeting of September 21, 1971. There is no evidence that at that time defendant had any knowledge that it was facing litigation so that it was put on notice that it should not pursue its customary practice of destroying these records. Anyone knowledgeable of business practices and the cost of storing records in these times would find it reasonable and not smacking of fraud for the defendant, with no knowledge of pending litigation, to follow its customary practice. We hold that under these circumstances the spoliation doctrine is inapplicable to the overtime equalization records even if they did contain information on the time spent in repairing station wagon tail-gates with the rubber weatherstripping raked off by the clam style tail-gate on the 1971 Chevrolet station wagon.

■ While the inspection tickets would show what repairs were required before a vehicle would be passed by the inspectors at the defendant's plant, plaintiff did not develop in what detail inspectors would enter the nature of the repairs to be made on the tickets so that one examining them could discern whether the repair to be effected involved the raking or tearing off of the rubber weatherstripping and how long it took to make repairs in those instances where this was required. Even Mr. Gregory's testimony as to the contents of an inspection ticket was that an inspection ticket would show what was wrong with a car the example he chose was "gate-fit." The evidence was that there were many reasons that could cause a station wagon to be rejected by an inspector because of "gate-fit." Mr. McGuire testified for the plaintiff and his testimony was that while the repair ticket would show the repair work to be done it would not show how much time was consumed in making the required repairs. Again, while he testified that during this period "we were all involved in tail-gates" he did not describe the nature of his involvement. While there was some disagreement between Mr. Gregory and Mr. Hare as to how long these repair tickets were required to be maintained by federal regulations, it is apparent that they were in existence for at least the current model plus two years or possibly until September of 1973.

There was no evidence that the time studies which would show how much time was spent in the hanging of a tail-gate were or were not still in existence nor whether any time studies had even been made as to how long it took to rehang a tail-gate on a 1971 Chevrolet station wagon because the weatherstripping was torn off by reason of insufficient clearance between the interior of the tail-gate and the weatherstrip retainer. Nor was there any evidence that the plain-

tiff used any of the discovery tools available to him for the purpose of ascertaining the existence of such records other than interrogatories filed sometime prior to trial (although the date of filing is not shown in the record) requiring the defendant to state the number of man-hours, including overtime, spent on tail-gate repair or change between January and June, 1971, in Final Process Building. Defendant responded to this interrogatory by stating that there were no records which would reflect the number of man hours spent on tail-gate repairs because repairmen worked on numerous repair items which might or might not include the repair of station wagon tail-gates.

There was no evidence that any of the other records mentioned were destroyed by the defendant.

■ Although the spoliation doctrine's application under some circumstances has been criticized,[8] the courts of this State have applied it in a number of cases.[9] However, since it is a harsh rule of evidence, prior to applying it in any given case it should be the burden of the party seeking its benefit to make a prima facie showing that the opponent destroyed the missing records under circumstances manifesting fraud, deceit or bad faith. *Brissette v. Milner Chevrolet Company,* supra. Not only should destruction of the records be proved, but there should also be such proof as is available under the circumstances that the records destroyed contained evidence which would aid the party seeking imposition of the rule in proving the elements of his case.

Despite the wide range of discovery tools available to the plaintiff to ascertain the existence of evidence in the control of his adversary which might be employed to aid him in establishing his case, we are cognizant of the paucity of discovery employed by the plaintiff in this case between the commencement of his lawsuit and the date of trial which, had it been employed, could have precluded the destruction of at least some of these documents and which might have assisted him in establishing whether defendant did enjoy measurable savings from the use of his suggestions. The failure to use these discovery tools under the circumstances of this case leads us to conclude that plaintiff has not adduced sufficient evidence to entitle him to rely on the doctrine of spoliation to supply the missing elements of his case.

This cause was filed in 1972 and came to trial in January, 1975. In the interim the plaintiff filed interrogatories seeking to ascertain whether the defendant could state the number of man-hours, including overtime, spent on repairing or changing tailgates on Chevrolet station wagons from January through June 1971. Defendant's answer was that there was no means of obtaining statistical information as to the number of station wagon tail-gates fitted or repaired during that period, and that there were no records which would reflect the number of man-hours spent on tail-gate repair. ·Plaintiff also requested the name and address of the employee or employees of the defendant having the custody or charged with the maintenance and the keeping of records showing the money expended by way of wages in particular functions and departments of the defendant. Defendant answered that there were no records available which would reflect the

8. McGuire and Vincent, *Admissions Implied from Spoliation or "Related Conduct,"* 45 Yale L.J. 226.

9. *Brissette v. Milner Chevrolet Company,* supra; *Garrett v. Terminal R. Ass'n of St. Louis,* 259 S.W.2d 807, 812 (Mo.1953); *Gaugh v. Gaugh,* 321 Mo. ·414, 11 S.W.2d 729 (banc 1928); *Beckman v. Raines,* 210 Mo.App. 253, 243 S.W. 192 (1922); *Shawhan v. Shawhan Distillery Co.,* 195 Mo.App. 492, 197 S.W. 371 (1917); *Shawhan v. Shawhan Distillery Co.,* 195 Mo.App. 445, 197 S.W. 369 (1916); *Stuckes v. National Candy Co.,* 158 Mo.App. 342, 138 S.W. 352 (1911); *Tracy v. Buchanan,* 167 Mo. App. 432, 151 S.W. 747 (1912); *Haid v. Prendiville,* 292 Mo. 552, 238 S.W. 452 (1922); *Hunt v. Sanders,* 288 Mo. 337, 232 S.W. 456 (1921); and *Owsley v. Owsley,* 34 S.W.2d 558 (Mo.App. 1931).

money expended by way of wages in particular functions and that the departmental records were maintained by "Robert E. Barrett, 3809 North Union Boulevard, St. Louis, Missouri, 63115."

From the record we discern that the plaintiff took the depositions of Mr. Tisoto, Carl E. Barth, William Bergin and Arthur L. Schmidt, because he read into evidence portions of these depositions as admissions against the defendant's interest to prove the scope of the investigation conducted by the members of the Committee in determining the amount of the award. The record is, however, devoid of any effort made by the plaintiff to obtain by means of subpoena duces tecum pursuant to the provisions of Rule 57.20 V.A.M.S. any of defendant's records once his suit had been commenced, nor did he offer any evidence that he sought an order pursuant to the provisions of Rule 58.01 (as it existed both prior and subsequent to January 1, 1975) that the defendant produce and permit him to inspect, copy or photograph the records he now contends were fraudulently and in bad faith destroyed.

This case, for some reason not evident in the record, dawdled in the Circuit Court, in the Federal District Court, and then again in the Circuit Court from August 23, 1972, when filed, until January 13, 1975, when it came on for trial.[10] According to plaintiff's evidence, corroborated by defendant's, the overtime equalization records were destroyed in accord with defendant's regular practice prior to the filing of the claim and prior to the time defendant had any reason to suspect that litigation might follow the action of the Committee. The inspection tickets, which were required to be maintained by the federal government for either five or two years—depending upon whether Mr. Gregory's or Mr. Hare's testimony was correct—after the model year, would have been destroyed in accord with defendant's

regular practice, in either 1973 or sometime in 1975. Absent any evidence that the defendant was put on notice by the plaintiff that these records were essential to the preservation of his case, or a court order that these records not be destroyed, we see no evidence of fraud or bad faith in a corporation destroying records it is no longer required by law to keep and which are destroyed in accord with its regular practices. As we have previously observed, storage of records for big or small businesses is a costly item and the destruction of records no longer required is not in and of itself evidence of spoliation.

■ With respect to the other records referred to—i. e. payroll records, time cards, salvage records and time studies—there is no evidence that these were not still in existence at the time of trial and unavailable to the plaintiff upon service of a subpoena duces tecum. It appears to us that plaintiff seeks to excuse his failure to fully explore the defendant's records by means of those tools of discovery available to him by imposition of the spoliation rule; under the circumstances of this case we do not believe that plaintiff's evidence entitles him to the application of the spoliation doctrine.

## VII.

We hold therefore, that plaintiff's evidence has failed to present a submissible case on the question whether defendant's Committee was "grossly mistaken" or "failed to use good faith" in applying the formula it did in arriving at its award because it fails to present substantial evidence from which a jury could find that the benefits enjoyed by the defendant from the use of plaintiff's suggestions were measurable. The judgment of the Circuit Court is therefore reversed and the cause is remanded to the Circuit Court with instructions to enter judgment for the plaintiff in the sum of $500.00.

10. The record shows the filing of this cause on August 23, 1972; defendant filed its petition for removal to the District Court on September 13,

1972 and remand of the cause to the Circuit Court on October 15, 1973.

SIMEONE, C. J., concurs.

GUNN, J., concurs in separate opinion.

GUNN, Judge.

I concur in the result reached by the majority opinion but would emphasize the binding effect of the Suggestion Committee's decision. The rules of the General Motors suggestion plan provide: "The Suggestions Committee decides whether or not suggestions are eligible for awards and determines the amount of each suggestion award paid for adopted suggestions." Also, "Decisions by the Suggestion Committee are final."

The foregoing rules give the Suggestion Committee considerable latitude in making its awards. As noted by the majority, there was apparently no caprice involved in the committee's decision in finding no measurable benefits and awarding the plaintiff $500. Hence, under the rules making the committee's decision final, no basis exists here for altering its award.